**In the Matter of the Termination of the Parent–Child Relationship of Ashley Peters and Tonya Renee (Peters) WALTZ, Appellant–Respondent,**

v.

**DAVIESS COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee–Petitioner.**

**No. 14A05–9101–JV–17.**

Court of Appeals of Indiana, Fifth District.

Oct. 9, 1991.

Mary B. Goss, Washington, for appellee-petitioner.

E. Brayton Smoot, Washington, for appellant-respondent.

BARTEAU, Judge.

Tonya Renee (Peters) Waltz appeals the termination of her parental rights in her daughter Ashley Peters, arguing the evidence did not clearly and convincingly prove that the conditions resulting in the child's removal would not be remedied. We reverse on that ground, and therefore do not address Peters' second argument of trial court error in admitting the testimony of a psychologist over an objection based on statutory privilege.

## BACKGROUND

Ashley Peters ("Ashley") was born on October 3, 1987, the daughter of Tonya Renee Peters ("Peters") and David O'Brien. On December 28, 1987 a bruised Ashley was examined by a physician who believed her injuries consistent with her parents' explanation that she had fallen from a chair. A much more dire injury befell four-month-old Ashley in early February, 1988. She was admitted to the hospital on February 7, suffering "seizures." A brain scan revealed bilateral subdural hematoma. Three doctors diagnosed "shaken baby syndrome," that is, cerebral hemorrhage and possibly permanent atrophy of brain tissue, resulting from the violent shaking of a child younger than eighteen months. Testimony at the subsequent termination hearings revealed that the degree of force necessary to inflict such an injury indicated intentional causation, that shaking was the most likely cause, that a sudden blunt impact to the skull was a possible cause, and that a fall from a chair was only a remotely possible cause. While Ashley was hospitalized for the seizures, a general examination including X-rays un-

covered no additional injuries. Regarding Ashley's head injury, criminal charges were not filed, due to lack of admission or proof.

Daviess County authorities swung into action upon learning of Ashley's trauma. On February 9 the court below entered an emergency detention order in favor of the county Department of Public Welfare ("DPW"). On February 12 the court found probable cause to believe that Ashley was a child in need of services ("CHINS")[1] and accordingly continued the emergency detention. On August 29, after the parties agreed that Ashley was a CHINS, the court ordered DPW to prepare a predispositional report. That report—recommending continued wardship—was adopted by the court as its dispositional order on September 27, 1988. The order continued in force after hearings on January 4, 1989, June 20, 1989 and March 21, 1990. Next, on April 3, 1990 DPW filed for termination of Peters' parental rights. The case was tried to the bench on August 15 and 17, 1990. On September 28, 1990 the court entered a judgment terminating Peters' parental rights.

DPW also sought to terminate O'Brien's parental rights. He and Peters had separated, and he consented to termination, so the case proceeded against Peters only. We further note that in April, 1989 Peters married Darrell Waltz. A son, Curtis, was born to them in August, 1989. DPW has not initiated any CHINS proceedings in regard to Curtis.

## DISCUSSION

"It is the policy of this state ... to strengthen family life by assisting parents to fulfill their parental obligations ... [and] to remove children from their families only when it is in the child's best interest or in the best interest of public safety." Ind.Code 31-6-1-1. Our supreme court has explained that termination is the exception rather than the rule, in that "[c]hildren are not taken from ... their parents because there is a better ... place for them

1. Ind.Code 31-6-4-3.

[but rather] because ... the custody of their parents is wholly inadequate for their very survival." *Matter of Miedl* (1981), Ind., 425 N.E.2d 137, 141. The discretion of trial courts in termination proceedings is cabined by I.C. 31–6–5–4(c), the version of which in effect at the time of the trial below required a petition for involuntary termination of parental rights to allege four elements:

(1) The child has been removed from the parent for at least six (6) months under a dispositional decree;

(2) There is a reasonable probability that:

(A) The conditions that resulted in the child's removal will not be remedied; or

(B) The continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) Termination is in the best interests of the child; and

(4) There is a satisfactory plan for the care and treatment of the child.

Termination is proper only if all four elements are shown by clear and convincing evidence. *B.R.F. v. Allen County Dep't of Pub. Welfare* (1991), Ind.App., 570 N.E.2d 1350; I.C. 31–6–7–13(a). This standard of proof follows from the fact that termination severs all of a parent's rights to the child, thereby extinguishing the constitutionally-protected right of the parent to make a home and raise the child, which has been recognized as one of "the basic civil rights of man." Commentary to I.C. 31–6–5–4 (West 1979) at 216–17 (quoting *Skinner v. Oklahoma* (1942), 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655).

There is no dispute here that Ashley had been removed from Peters for at least six months under a dispositional order, I.C. 31–6–5–4(c)(1), and that there was a satisfactory plan for Ashley's care and treatment, I.C. 31–6–5–4(c)(4). Resolution of this case therefore turns on the two remaining elements of the termination statute, I.C. 31–6–5–4(c)(2) and (3).

Peters contests the trial court's ruling as to I.C. 31–6–5–4(c)(2). On (c)(2), the trial court entered the following conclusion of law:

4. The evidence is clear and convincing that the conditions that resulted in the child's removal will not be remedied. The mother continues to have violent outbursts of temper, while she is on medication for impulse control; the mother fails to explain satisfactorily the circumstances of the harm to Ashley or the seriousness of the harm. The mother understood the services offered [by DPW] and willfully failed to take advantage of the services including homemakers and counseling and visitation.

5. The mother has failed to come to terms with the seriousness of Ashley's injuries and any participation in those injuries. The mother offers no explanation for the child's harm except that the child fell from a chair in December, 1987....

....

9. ... [T]he Court finds a pattern of conduct by the mother that has not changed since September, 1988. Violent outbursts of temper on more than one (1) occasion were observed by a police officer, and at the Welfare Department, and at foster mom's.

The mother offers no acceptable explanation of the child's injuries or mother's role in those injuries. The injury to the child resulted from being severely shaken, not falling from a chair.

Record at 63–66.

The court below, in conclusion 4, focused on the first alternative of I.C. 31–6–5–4(c)(2), that is, the existence of a reasonable probability of no remedy of the conditions that resulted in Ashley's removal. The court did not reach any conclusion as to the second alternative of I.C. 31–6–5–4(c)(2), that is, continuation of the parent-child relationship would pose a threat to the child's well-being. Therefore, we disregard Peters' argument that the court erred in concluding the existence of the second alternative. Instead, we limit our review to Peters' contention the court erred in holding termination was supported by clear and convincing evidence of non-remedy of the

conditions resulting in termination. Similarly, DPW's brief is somewhat non-responsive to Peters' argument addressing I.C. 31–6–5–4(c)(2). DPW cast its answer in terms of I.C. 31–6–5–4(c)(3). Nevertheless, we decline to find waiver, because the text of DPW's brief adequately addresses the issue of non-remedy, even if incorrectly captioned.

At the outset, we perceive that this case necessarily incorporates an assumption, or at least, a suspicion, that Peters was the one who shook Ashley. Uncontradicted medical testimony explained that shaken baby syndrome occurs in an instant and is not immediately apparent. Thus, the act could be silently committed by one parent, even in the presence, but not the sight, of the other. Ashley, when shaken, was in the care and custody of her genetic parents, Peters and O'Brien. Since then, Peters and O'Brien have separated, with O'Brien retaining no contact with Ashley, due to voluntary termination of his parental rights. Thus, if O'Brien shook Ashley, then the condition that led to her removal has been remedied, and termination would be improper due to failure of proof of I.C. 31–6–5–4(c)(2)(A). Therefore, Peters is, at a minimum, suspected by DPW of having caused Ashley's injury. Because there is no direct evidence inculpating Peters in the shaking, the suspicion arises by inference from Peters' custody of Ashley at that time and Peters' subsequent refusal to blame O'Brien.

Peters presents a bifurcated argument regarding non-remedy: first, because of the passage of time, it is unlikely that Ashley could again suffer shaken baby syndrome, and therefore the condition that led to her removal has been remedied; and second, DPW failed to clearly and convincingly show "that returning Ashley to [Peters'] custody would return the child to a set of conditions where she would be again physically abused or ... permanently damaged through [Peters'] failure to properly provide for Ashley's needs." Appellant's Brief at 26. To consider that dichotomy, we note this case stems from a discrete instance of misconduct, rather than from any pattern thereof. DPW's wardship began after someone shook Ashley. Yet, a comprehensive examination including X-rays indicated no other abuse, and Ashley's earlier injuries were deemed consistent with a fall.

Although it is possible that Ashley was shaken more than once, such shaking would have occurred within a narrow time frame, was unaccompanied by other types of abuse, and can therefore be deemed one incident of abuse. Thus, this case differs from others turning on whether conditions leading to removal had been remedied, because such cases routinely involve ongoing patterns of substandard care. *See, e.g., Matter of D.B.* (1990), Ind.App., 561 N.E.2d 844; *J.K.C. v. Fountain County Dep't of Pub. Welfare* (1984), Ind.App., 470 N.E.2d 88. Insofar as the origins of this case lie in one distinct episode of shaking an infant, and because Ashley's age eliminates the peril of repetition, Peters' first premise is logically immaculate. However, we view that premise as an unduly narrow perception of the conditions leading to removal. The condition in need of remedy is better defined, as in Peters' second formulation, as a household in which children are in danger of physical abuse. So, the question becomes one of sufficiency of the evidence, that is, whether DPW clearly and convincingly showed a reasonable probability that returning Ashley to Peters would place the child in jeopardy of further violence. We hold that DPW did not meet its burden of proof.

When reviewing the sufficiency of evidence supporting involuntary termination of parental rights, we neither reweigh the evidence nor judge the credibility of witnesses. *Matter of D.B., supra.* We consider only the evidence favorable to the judgment, and the inferences reasonably drawn from that evidence. *Id.* Additionally, when the trial court, as in the case at bar, makes detailed findings of fact and conclusions of law, we employ a two-tier standard of review. First, we determine whether the evidence supports the findings of fact; second, we determine whether the findings of fact support the judgment. *Keystone Square v. Marsh Supermarkets*

(1984), Ind.App., 459 N.E.2d 420, *reh'g denied, trans. denied.* We reverse only upon a showing of clear error. Ind. Trial Rule 52(A). Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *DeKalb County E. Community School Dist. v. DeKalb County E. Educ. Ass'n* (1987), Ind.App., 513 N.E.2d 189, 191. To synthesize, we will affirm termination unless we definitely and firmly believe that the evidence favorable to the judgment does not clearly and convincingly support the trial court's findings of fact, or unless we definitely and firmly believe that the findings of fact favorable to the judgment do not clearly and convincingly support the judgment.

The trial court made fifty findings of fact. Therein we find clear error, ranging from minor points to the critical. Beginning with the minor errors, finding 47 incorrectly states that Peters offered into evidence a certain deposition, which actually was offered by DPW as its exhibit 14. Record at 242–44. Finding 35 describes Ashley's half-brother Curtis as a stepbrother.

Turning now to more material findings, 27 is that Peters failed to pay support as ordered. The order in question required Peters to pay $20 in support in any week in which she earned $100. Yet, there is no evidence as to the extent of Peters' earnings, so finding 27 is unsupported by the evidence.[2] Finding 20 states that Peters willfully failed to comply with the recommendations of DPW, including missing visits with Ashley and missing counseling sessions. A homemaker testified that "once for me and several times for the other homemaker" nobody answered the door at the Waltz residence when Ashley was brought there for visitation. Record at 521. The same homemaker also testified that during a period when Peters had a scheduling conflict, DPW was unable to schedule visitation for a time convenient to Peters. Accordingly, Peters did not attend the sessions, but her husband Darrell Waltz did. A clinical social worker testified in a deposition in July, 1990 that she had seen Peters approximately thirty times since March, 1988. More specifically, the social worker listed seven dates in 1990 on which visits had been scheduled. Peters attended five of seven. We deem these facts insufficient to clearly and convincingly support a finding that Peters willfully failed to comply with DPW's program.

Finding 37 states the social worker described Ashley as withdrawn when with Peters. This finding inaccurately characterizes the evidence. The social worker did testify "when I would see [Ashley] with her mother, she was mute; there was no verbal interaction at all, even though she had exhibited the ability to talk at other times." Record at 218. Yet, the testimony continued "then I saw [them] on July 11th, and I did notice a significant improvement in their relationship. At that time, Ashley did appear more comfortable with her mother, although she still was very, very quiet." Record at 219.

Finding 33 also suffers mischaracterization of the evidence, stating that Darrell Waltz "has no steady employment, working in five (5) places in the past year. [Peters] caused his loss of job by her conduct at the work place in fights and harrassing other workers." The record shows that Waltz left his job at a Wendy's fast-food restaurant after Peters caused a disturbance in the parking lot there, leading to her arrest for disorderly conduct. There is no evidence that Peters "caused" Waltz's job changes. Waltz testified that he had worked at Hardee's for a year and eight months before being fired for absence. Then, he worked at Ponderosa for a month before quitting. Next, he worked at Wendy's for six or seven months. His next job was at Arby's, where he worked six or seven weeks before quitting to work at the Perdue turkey processing plant. Waltz

2. The extent of testimony on the point is as follows:

Q. To your knowledge, did [Peters] work at all from September of '88 to date?

A. She worked at Hardee's briefly, I believe. She worked at Big Lots, briefly, over the Christmas season. She worked at Pizza Hut. That's all I remember off the top of my head. Record at 241.

testified that he had been working at Perdue for one month and four days, that his weekly net pay was nearly $200, compared with $130–$150 at fast-food restaurants, and that he was anticipating a 20% wage increase after passing the sixty-day probation period and enrollment in the company's insurance program in three more months. He stated his happiness with working at Perdue, and that he had within the past few weeks purchased a car, having been without one for over a year.

Finding 34 states that "husband admits he can not [sic] control [Peters] or limit her conduct." DPW makes the same statement in its brief, but DPW's citation to the record does not support the finding. Nor have we found support for finding 34 in our review of the record.

Keeping in mind our inquiry—whether clear and convincing evidence showed a reasonable probability that the condition of exposure to physical abuse had not been remedied—we turn to what seems a crucial point. Finding 35 is that "[t]he step-brother [sic], age one (1) year, has been treated at the Daviess County Emergency Room five (5) times since birth." This finding, as presented, tends to support an inference that Peters cannot properly maintain an infant, and colors the inference of an abusive parent. The finding is at once technically correct and completely misleading. The evidence shows that half-brother Curtis received treatment at the emergency room because it was the closest medical facility to the automobile-less Waltzes. More importantly, all five visits were for the ordinary maladies of an infant, such as respiratory distress, adverse reaction to prescribed medication, and possible conjunctivitis. There is absolutely no suggestion of abuse, as would be necessary to consider finding 35 supportive of termination.

The record supports a picture of Peters as a hot-tempered individual. For her actions in a disturbance at her husband's workplace, she was arrested and pleaded guilty to disorderly conduct. Peters also lost her temper at the foster parents' home. After arriving there expecting to take Ashley for an unsupervised visit, Peters, when told the visit had been cancelled, used foul language and tried to force her way through the front door as the foster mother tried to close it. There is evidence that Peters' temper is the product of her underlying personality exacerbated by the effects of a brain injury she suffered when she fell from a moving car in April, 1988, that to date medicine has not been completely successful at moderating Peters' disposition, and that medicine may not ever be completely successful. However, all the evidence regarding Peters' temper involves disputes with other adults. There is no evidence of Peters being in any way aggressive, violent, or abusive to either Ashley or Curtis. We note the trial court's conclusion of law 9 refers to a pattern of "violent outbursts of temper" unchanged "since September, 1988." This is a curious conclusion, in the sense that the case proceeded on an inference that Peters abused Ashley in February, 1988.

In termination of parental rights, each case is unique, leaving room for judicial disagreement. *See, e.g., Matter of Robinson* (1989), Ind., 538 N.E.2d 1385, 1388 (Dickson, J., dissenting from affirmance of termination); *Egly v. Blackford County Dep't of Pub. Welfare* (1991), Ind.App., 575 N.E.2d 312, 316 (Baker, J., dissenting from reversal of termination). In the case at bar, we are left with a definite and firm conviction the evidence does not clearly and convincingly show that the conditions leading to Ashley's removal have not been remedied.

REVERSED.

RUCKER and ROBERTSON, JJ., concur.