**Hugh TIPTON and Billy Boster, Appellants–Respondents,**

v.

**MARION COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee–Petitioner.**

No. 49A02–9302–JV–89.[1]

Court of Appeals of Indiana, First District.

March 2, 1994.

1. This case was transferred to this office February 1, 1994, by direction of the Chief Judge.

Mark E. Bell, Bell & Bell, Indianapolis, for appellants-respondents.

Elizabeth G. Filipow, Marion County Office of Family and Children, Indianapolis, for appellee-petitioner.

ROBERTSON, Judge.

Hugh Tipton and Billy Boster appeal the termination of their parental rights with respect to their children, W.T., and E.B., respectively, who were born of the same mother. W.T. was born on March 8, 1988. E.B. was born on April 1, 1989. The children became wards of the State on September 14, 1989. Termination occurred on November 4, 1992.

We reverse as to Tipton but affirm as to Boster.

To obtain a termination of the parent-child relationship, the petitioner must allege and prove that

(1) the child has been removed from the parent for at least six (6) months under a dispositional decree:

(2) there is a reasonable probability· that:

 (A) the conditions that resulted in the child's removal will not be remedied; or

 (B) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child.

Ind.Code 31–6–5–4(c); I.C. 31–6–5–4.3.

■ The federal constitution dictates that the petitioner prove these elements by clear and convincing evidence. *Santosky v. Kramer* (1982), 455 U.S. 745, 763, 102 S.Ct. 1388, 1400, 71 L.Ed.2d 599; *Egly v. Blackford County Department of Public Welfare* (1992), Ind., 592 N.E.2d 1232, 1234; *Waltz v. Daviess County Department of Public Welfare* (1991), Ind.App., 579 N.E.2d 138, 140, *trans. denied; Matter of VMS* (1983), Ind.App., 446 N.E.2d 632, 636. The stricter standard of proof is applied in part because of the State's power to shape the historical events that form the basis for termination; the State's unusual ability to structure the evidence in a termination proceeding increases the risk of an erroneous factfinding. *Santosky,* 455 U.S. at 763, 764, 102 S.Ct. at 1400. Hence, the standard of proof, by its very terms, demands consideration by the trial court of the quality of evidence as well as quantity. *Id.*

■ When we review a termination of parental rights by a trial court, we will not reweigh evidence nor judge the credibility of witnesses. *Waltz,* 579 N.E.2d at 141; *Page v. Greene County Dept. of Public Welfare* (1991), Ind.App., 564 N.E.2d 956, 959. Rather, we consider only the evidence and inferences reasonably drawn from the evidence, which are most favorable to the judgment. *Id.* When reviewing findings of fact and conclusions law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review: we determine whether the evidence supports the findings; then we determine whether the findings support the judgment. *Id.* We will set aside the trial court's findings and judgment only if they are clearly erroneous. Ind.Trial Rule 52(A); *Egly,* 592 N.E.2d at 1235. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *Id.; Waltz,* 579 N.E.2d at 142.

The fathers challenge the sufficiency of the court's findings and the evidence as to all but the fourth element of proof. Accordingly, we direct our attention to the other three.

## I.

■ The fathers argue that the DPW failed to prove that their children had been "removed from the parent" for at least six (6) months under a dispositional decree. Indiana Code 31–6–1–23 defines the term "parent" as used in Article 6 to include both parents regardless of their marital status.

Although the legislature has not expressly provided a definition of the term "removed," the terms "removed" or "removal" are used repeatedly throughout the article in conjunction with the notions of "detention," "out-of-court placement," and the child being "taken into custody" to protect the child and ensure his safety. See, e.g. I.C. 31–6–4–4(d) (Permitting caseworker to take the child into custody if, among other things, "consideration for the safety of the child precludes the immediate use of family services to prevent removal of the child"); I.C. 31–6–4–6(f) ("If a child has been removed from his parent ... under section 4(d) ... the court shall make written findings ... that state: (1) whether removal ... was necessary to protect the child; (2) a description of the family services available before removal of the child; ... (4) why the efforts made to provide family services did not prevent removal of the child"); I.C. 31–6–4–10(c) ("The [CHINS] petition ... must contain the following information: ... (7) A statement indicating whether the child has been removed from the child's parent ..."); I.C. 31–6–4–15.3(i) (The court shall accompany its dispositional decree with written findings and conclusions upon the record concerning, among other things, the efforts made to prevent the child's removal from the parent). Since it is readily apparent that a child can be removed from a

parent before CHINS proceedings have even been initiated, removal under a dispositional decree must refer to a dispositional decree which authorizes an out-of-home placement. *See* I.C. 31–6–4–15.3(e), (f).

 The record reflects that, pursuant to a dispositional decree, the court ordered supervision of the children by the DPW with placement in the mother on September 27, 1989. On July 26, 1990, the court held a hearing to review its jurisdiction and the placement of the children. The entry shows that the court ordered "the children continued under supervision of the MCDPW with placement in foster care." The record thus establishes that on July 26, 1990, the court modified the original dispositional decree to "[r]emove the child[ren] from [their] home and place [them] in another home ..." I.C. 31–6–4–15.4(a)(3); I.C. 31–6–4–19(h). The testimony establishes that the children were removed from their home on the following day, July 27, 1990. The fathers did not have physical custody of the children when they were removed. Nonetheless, the children were effectively removed from both of their parents when they were removed from the physical custody of the mother and placed in another home pursuant to the modified dispositional decree of July 26, 1990. Accordingly, we conclude that the trial court did not err in finding that the children had been removed from their fathers for a period of at least six (6) months under a dispositional decree.

## II.

The fathers argue that the evidence offered at the termination hearings is insufficient to sustain the trial court's findings and that the findings do not permit the conclusion that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied or that continuation of the parent-child relationships poses a threat to the well-being of the children.

 To determine whether a reasonable probability exists that the conditions justify-

ing the child's removal from the home will not be remedied, the trial court should determine the parent's ability to meet the needs of the child as of the time of the termination hearing, taking into account any evidence of changed conditions. *R.M. v. Tippecanoe County Department of Public Welfare* (1991), Ind.App., 582 N.E.2d 417, 419. Due to the permanency of termination, the trial court must also consider the parent's habitual patterns of conduct as a means of determining the probability of future detrimental behavior. *Id.*

 The DPW did not introduce into evidence the CHINS petition, the predispositional report, the parental participation order, the modification report or any other document or order containing written findings, which was required to be created during the proceedings. *See* I.C. 31–6–4–15.3(i) (requiring written findings at dispositional stage containing the court's reasons for disposition). Neither did the DPW ask the court to take judicial notice of the underlying CHINS proceedings. Hence, none of the record of the CHINS proceedings is before us.

The DPW made no showing of the conditions which brought about the filing of the CHINS petition in the first instance, or necessitated removal of the children from the mother in late July, 1990. If certain circumstances, conditions or behaviors of the fathers necessitated the wardship or were so harmful that they prevented the DPW from recommending placement of the children with their fathers once they had been physically removed from the mother, the DPW made no effort to demonstrate what those circumstances were at the termination proceedings. This dearth of evidence explains the absence of any finding concerning the neglectful or abusive nature of the father-child relationships historically, before removal.[2]

 The DPW's caseworker, who had been assigned to the case in April, 1992, after

---

2. In refusing to make a finding identifying the conditions which necessitated removal, the trial court rejected the only evidence of record concerning the conditions prior to removal: that the

fathers gave their children affection, provided food and diapers, took the children for extended periods of time and had the support of extended family.

termination proceedings had already been initiated, testified that the DPW was recommending termination because of the fathers' lack of involvement since the DPW acquired wardship, the results of the Minnesota Multiphasic Personality Inventory (MMPI) given the fathers, the failed appointments, and the need of the children for a permanent home.[3] However, this court has routinely looked beyond the factors identified by the DPW to the totality of the evidence in ascertaining whether the statutory criteria have been met. *See e.g., Matter of Fries* (1981), Ind.App., 416 N.E.2d 908. The caseworker testified that, for the DPW to recommend reunification, the fathers needed to complete a parenting assessment and attend parenting classes, provide a stable environment and maintain a proper home, demonstrate financial stability and start regular visitation.

The trial court made findings relating to each of the DPW's conditions for reunification. The court found that neither father completed a parenting assessment or attended parenting classes, and that neither participated in counseling.[4] The court also found that both fathers failed to demonstrate stability in housing or to demonstrate a consistent financial ability to care for their children, and that both fathers failed to visit with their children on a consistent basis during the time they were CHINS.

With regard to the finding of instability in Tipton's housing, the record contains this evidence: Since W.T.'s birth, better than a four-year period, Hugh Tipton had lived at three residences, all belonging to other family members. Three persons including Tipton lived at his grandmother's house which had four bedrooms. Four people including Tipton lived at his aunt's home which had three bedrooms. Tipton paid rent when he lived at those places. At the time of the hearings, he was living with his brother in a four-bedroom house with five other people, including W.T.'s cousins.

The trial court did not conclude that Tipton could not provide his child with an adequate home because he moved too frequently or that these places were not suitable for a child, only that Tipton had not demonstrated "stability" in housing. The DPW did not offer any evidence that anyone from the State had ever visited Tipton's home. In the absence of evidence showing either the familial relationships or environments to be harm-

---

**3.** The children's interest in permanency is a consideration in termination proceedings only after the natural parent has been shown to be unable to provide that permanency. *Santosky v. Kramer* (1982), 455 U.S. 745, 763, 767, 102 S.Ct. 1388, 1400, 1402, 71 L.Ed.2d 599. The Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest. *Quilloin v. Walcott* (1978), 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54 L.Ed.2d 511. *Accord R.M. v. Tippecanoe County Department of Public Welfare* (1991), Ind.App., 582 N.E.2d 417, 421 (This court would not condone the breakup of a natural family for the sole reason it would be in the child's best interests).

**4.** These findings are essentially accurate but somewhat misleading. For example, the trial court found that neither father completed his parenting assessment "although several appointments were scheduled for him." Both fathers completed the first phase of the assessment, the MMPI, but did not appear for the clinical interview. Boster missed three appointments for the interview. Tipton missed the first appointment for the MMPI and an appointment for the clinical interview which had been rescheduled be-

cause of a conflict with the termination proceedings.

The trial court found neither father completed parenting classes over the course of the three years their children were CHINS. This is true but the record does not evince an outstanding order to attend parenting classes or any requirement that the fathers change any particular behavior, pattern of conduct, or circumstances, or develop any particular parenting skills. In the absence of some deficiency as a parent, the requirement that the fathers attend parenting classes is an empty one, with no measure of success other than the fact of completion. Likewise, the trial court found that neither father had participated in counseling to address personal or parenting issues, but again, the record does not reflect that either father was required to participate in counseling, other than parenting classes, as a condition of reunification or visitation. Hugh Tipton's MMPI revealed that he had no emotional problems.

Other findings are equally inexact. For example, the trial court found that both fathers failed without justification to attend some of the CHINS court hearings with regard to their children. The record reflects that Boster attended six of nine hearings; Tipton attended two of nine.

ful to the child, or that three moves in four years alone would be detrimental to the child if they occurred in the future, *cf., Shaw v. Shelby County Department of Public Welfare* (1992), Ind.App., 584 N.E.2d 595, 601 (Mental deficiencies of parents alone do not justify termination without evidence of harm or possible future harm), the purely subjective nature of the finding must reflect a class or cultural judgment that the lifestyle chosen by Tipton would be prejudicial to the best interests of the child. The child's *best* interests are not relevant to the fitness of this father to parent his child. Parental unfitness must be established on the basis of individualized proof. *See Stanley v. Illinois* (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551.

The evidence offered on the matter of housing does not support a reasonable inference that Tipton's living arrangements pose or have ever posed a threat to the well-being of his child. The finding that Tipton has not demonstrated stability in housing is therefore not supported by the record and cannot support the judgment.

On the subject of Hugh Tipton's financial ability to care for his child, Tipton testified at the first hearing that he had worked since his child was born. He made about $800 per month. At the time of the hearing, he was working regularly, in construction, every month all month long. He was out of work a couple of weeks at one point when the entire crew got fired because the supervisor was drinking on the job and a couple of weeks on other occasions because of the weather. At the time of the second hearing, he had been working for $7.00 per hour on a roofing job for about a month and a half but admitted that he "did not have consistent full-time employment over the last three years."

Hence, if we do not weigh the evidence, Tipton's admission, perhaps substantiated by his statement that there were seasonal lay-offs, is sufficient to permit the determination that he had not demonstrated that he "consistently" had the financial ability to care for his child. But, the burden of proof is upon the State, not the father, to show either a reasonable probability that the neglect or dependency of the child caused by the father's inconsistent income would not be remedied or that it poses a threat to the well-being of the child. Unless the father's poverty causes him to neglect his child or exposes the child to danger such that removal from his care would be warranted, the fact that the father is of low or inconsistent income of itself does not show unfitness. *See Matter of D.T.* (1989), Ind.App., 547 N.E.2d 278, 285, *trans. denied.* Again, the DPW made no showing that the father's economic circumstances posed a threat to the child's well-being; indeed, it appears to the contrary that the father's living arrangement with extended family provided a safety net during the periods when the father was temporarily unemployed. Unfitness cannot be presumed; it must be proved. *Stanley,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. The fact of inconsistency in income shown by the record does not support a reasonable inference that Tipton's economic circumstances pose a threat to his child, or would ultimately lead to the child's removal from him.

As to Boster, the record reflects that, as of the September, 1992 hearing, he resided in a two-bedroom apartment and had so resided for six weeks. Since E.B.'s birth, he had lived with his brother for a month and one-half, his mother for a little bit over a year, stayed with the mother of E.B. and a second girlfriend for about two months each, and then moved back in with his mother for about three weeks. Thus, the record does show a pattern of frequent change in his housing.

At the time of the hearings, Boster was working full-time, all year long for Avalos Construction, making $6.00 per hour, eight hours a day, six days per week. Over the period of the wardship, he had worked for Avalos for two years but was laid off some of that time, worked for somebody else for two months, and then was hired on in a permanent position for the last year and one-half. Hence, the portion of the finding which states that Boster had failed to demonstrate the "consistent financial ability" to care for his child is not sustained by the record. Boster has had steady income from his employment for a year and one-half.

The court's findings, that the fathers were offered visitation with their children but

failed to visit, are not supported by the record. The DPW initiated proceedings in May, 1989 and the children became wards of the DPW on September 27, 1989. Neither child was removed from the custody of the mother until July 27, 1990. Until that time, the only evidence of record shows both fathers to have visited with their children regularly, frequently, and sometimes for extended periods of time. Apparently, these proceedings were initiated about the time W.T. was burned while in the custody of the mother and hospitalized at Riley Hospital for Children. Hugh Tipton was at the hospital every day during the period of hospitalization.

Following the removal of the children from the mother's physical custody in July, 1990, the record contains no evidence of the missed opportunities provided the fathers for visitation. Both fathers contended that they were denied any opportunities for visitation by the DPW, and this contention appears to be substantiated at least in part by letters to both fathers, written in June, 1992, forbidding visitation until parenting and drug/alcohol assessments had been completed. Hugh Tipton testified that he did not know where W.T. was and that his mother had been permitted visitation but he had not. Tipton last saw W.T. on Christmas Eve, 1990.

Boster last saw E.B. about a year and one-half before the second hearing. He visited E.B. at Family Connections with the mother. The DPW offered the testimony of the foster mother who had taken E.B. to Family Connections on one occasion to visit with Boster. She admitted that the children had gone to Family Connections for visitation on other occasions and she had no knowledge of who was there to visit. There is thus no evidence to support the trial court's finding that the fathers had been offered visitation, or that they failed to take advantage of it when it was offered.

■ The trial court's other factual findings as they relate to Tipton, while perhaps necessary to show a reasonable probability that the circumstances would not change, do not fill the evidentiary void. The findings relating to visitation are the only findings which speak to the parent-child relationship itself. As we have already indicated, these findings are not supported by the evidence of record. The fathers' failure to appear for assessments and court hearings reflect ambivalence, the failure to attend parenting classes an unwillingness to change existing conditions; but, the fathers' refusal to permit the DPW to further investigate their circumstances in and of itself is not the statutory ground for termination.

■ The DPW also presented evidence concerning the personality of the fathers obtained from the results of the Minnesota Multiphasic Personality Inventory. We address the results of Hugh Tipton's MMPI first. The trial court found that the "results of the MMPI performed on Tipton showed his 'impulse control and judgment are only fair.' 'His impulsiveness and low frustration tolerance coupled with his resentment of external demands couple (sic) impair his ability to function optimally as a parent.'" This finding is supported by the evidence, but on its face, it does not support the judgment. The statute requires a showing that the parent-child relationship poses a threat to the well-being of the child, not simply that it is less than optimal.[5]

■ The trial court found that the "results of the MMPI performed on Boster showed 'Mr. Boster's depression, anxiety, poor judgment and impulse control, and resentment of external demands all suggest an inability to function adequately as a parent. His emotional problems are such that he is only marginally capable of managing his life; and would not be able to care for a child.

---

5. The use of the MMPI results in this case is disturbing for the reason proffered by the DPW's witness: "the best way to determine how valid a particular interpretation [of the test] might be would be to go and look at the person's past behavior and then, ... to look and see how well it matches up with future actions on the individual's part." As to Tipton, no evidence of past or present behavior, other than a resistance to change and an unwillingness to cooperate, was offered by the DPW. Hence, the reliability of the instrument both as a personality assessment and a predictor of future conduct was never established. While troubling, the accuracy of the instrument's interpretation effects the weight to be accorded this evidence, a matter for the trial court.

His suspiciousness and tendency to externalize responsibility for problems suggest that he may be resistive to therapy, but he needs to resolve his own problems before parenting issues can be addressed.'" This finding is supported by the evidence.

Moreover, the evidence provided by the MMPI coupled with the other evidence of record concerning Boster show a reasonable probability that the emotional problems evidenced by the MMPI which prevent him from being a capable parent will not be remedied. There is some evidence in the record both that Boster has an inability to manage his own life, as the results of the MMPI suggest, in the form of the pattern of housing choices Boster made for himself during the period of wardship, and that this inability to care for himself or his child will not be remedied. Boster missed three appointments for the MMPI and did not appear for the clinical assessment which would have been the basis for determining the nature of counseling which would be appropriate for him. Boster did not seek counseling on his own. Boster admitted that he knew he had to obtain housing which would be suitable for a child but he did not do so during the period of wardship until immediately before the termination hearing. He did not take steps to find suitable housing for both himself and his child, or follow through on the parenting assessment even though the opportunity to visit with his child depended upon it. This being the case, we find there was evidence of a clear and convincing nature which would permit the trial court to reach the ultimate factual conclusion either that there existed a reasonable probability that the conditions which resulted in removal from Boster would not be remedied, or that the parent-child relationship as it existed at the time of the final hearing posed a threat to the well-being of the child.

### III.

The trial court found that it was in the best interest of the children to terminate the parental rights of Tipton and Boster, and thus to provide the opportunity for the children to have a permanent and stable adoptive home. The court also found that the children need a permanent, safe and stable home in order to meet their needs for "a normal healthy emotional and physical development." In support of these findings, the DPW's caseworker testified that the children needed a permanent life and that the DPW had already targeted a set of potential adoptive parents who wanted a sibling group. The children's mother had voluntarily relinquished her parental rights, and termination of the parental rights of the father of the third child had already been accomplished.

We reiterate that the DPW offered no evidence that the children had ever been harmed by the relationship which existed with their fathers. The DPW introduced no evidence pertaining to the physical or emotional development of either of the children, either in terms of how the children had been doing overall or since they had been placed in foster care. In this respect, the case against Tipton is factually analogous to *In the Matter of A.M.* (1992), Ind.App., 596 N.E.2d 236, *trans. denied.*

When an individual is truly unfit to parent, the child evinces the harmful nature of the relationship, and the State can easily meet its burden of proving that termination is in the child's best interest. The State did not have or failed to garner that kind of particularized evidence and offered little evidence that it knew anything about the nature of either father's relationship with his child, even though guardians ad litem had been appointed for the children. Instead, the DPW asked the court to assume that termination would be in the child's best interest.[6] The U.S. Constitution requires that the

---

**6.** The U.S. Supreme Court has at least twice recognized the absence of empirical support for the assumption that termination will inevitably help the child. In *Smith v. Organization of Foster Families for Equality & Reform* (1977), 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14, the Court cited evidence in the record, confirmed by published studies, to the effect that it was rare for a foster child to achieve a stable home life through final termination of parental ties and adoption into a new permanent family. And, in *Santosky*, 455 U.S. 745, 765, n. 15, 102 S.Ct. 1388, 1401 n. 15, 71 L.Ed.2d 599, the Court referred to the assumption, that termination of the parental relationship will invariably benefit the child, as "hazardous at best," weighing the absence of empiri-

DPW prove this proposition by clear and convincing evidence. It has not done so as to Tipton.

However, the record as it relates to Boster contains some evidence of probative value from which it could reasonably be concluded that termination of the parent-child relationship would be in the best interest of E.B. E.B. has an opportunity for adoption which will provide her permanency with her sibling. The record shows Boster to be unable because of his emotional problems to make choices which place E.B.'s interests before his own. In light of Boster's inability to care for E.B.'s emotional needs, and the opportunity presented to keep E.B. with her sibling, the trial court could conclude that it was in E.B.'s best interest to terminate the parental relationship as a means of preserving the sibling relationship. Such a conclusion does not leave us with a firm conviction that a mistake has been made.

Judgment affirmed as Boster, reversed as to Tipton.

BAKER and FRIEDLANDER, JJ., concur.

cal support for such an assumption in favor of the parent when fashioning a standard of proof which allocates the risk of an erroneous determination between the parent and child.