Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 22 2013, 9:26 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DALE W. ARNETT**
Winchester, Indiana

ATTORNEYS FOR APPELLEE:

**JAMES E. MOORE**
Indiana Department of Child Services
Muncie, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) | |
| N.S. (MINOR CHILD) | ) ) | |
| AND | ) ) | |
| D.S. (FATHER), | ) ) | No. 68A05-1209-JT-490 |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE CIRCUIT COURT OF RANDOLPH COUNTY
The Honorable Jay L. Toney, Judge
Cause No. 68C01-1202-JT-11

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

D.S. ("Father") appeals the involuntary termination of his parental rights to his child, N.S. Father raises the following restated issues: (1) whether N.S., who was physically removed from the home of Mother, the custodial parent, was also removed from Father, the non-custodial parent, for purposes of the statute providing for the involuntary termination of parental rights; and (2) whether there was sufficient evidence to support the trial court's judgment terminating Father's parental rights.

We affirm.

## Facts and Procedural History

The facts most favorable to the juvenile court's judgment reveal that on February 17, 2010 the Randolph County Department of Child Services ("RCDCS") received a report that Mother shook N.S., the home was dirty, and that N.S. was outside in inappropriate clothing. This report was substantiated, and N.S. was removed from the home. RCDCS filed a petition stating that N.S. was a child in need of services ("CHINS"). In April 2010, N.S. was returned to both Mother and Father after they entered into an Informal Adjustment, agreeing to participate in services in an effort to prevent their child/children from being formally adjudicated as CHINS.

Approximately one month later, on May 3, 2010, RCDCS received a second report that N.S. lost weight, was lethargic, and had swollen feet. On June 18, 2010, RCDCS received a report that N.S. had a sizeable bruise on her left cheek. Around this time

doctors diagnosed N.S. with failure to thrive. On July 4, 2010, Father moved out of the home. N.S. remained with Mother. On July 26, 2010, RCDCS received a fourth report alleging that that N.S. had lost weight for the second time in a month; that Mother took N.S. out until 1:30 a.m. without food; and that N.S. was sunburned. All three reports were substantiated by RCDCS. On July 30, 2010, RCDCS filed a request for an emergency order to remove N.S. from the home. The order was granted, and N.S. was placed in foster care.

On August 3, 2010, the juvenile court found that there was probable cause to believe that N.S. was a CHINS and ordered N.S. to remain in foster care. Father appeared at this hearing, and the juvenile court appointed counsel for Mother and Father. On August 24, 2010, Father appeared without counsel at the second initial hearing. The court found that Father was not in a position to admit or deny the allegations since Mother was the child's caregiver. Mother appeared at the hearing with counsel and admitted that N.S. was a CHINS. The juvenile court adjudicated N.S. as a CHINS and set a disposition hearing for September 29, 2010, apparently notifying both Father and Mother in open court, or at least notifying their respective attorneys.

Father appeared with counsel at the September 29, 2010 dispositional hearing. While Mother did not appear, her attorney did appear on her behalf. The court accepted RCDCS's Predispositional Report recommendations. The court ordered Father to:

- Notify the family case manager of any changes in address, household composition, employment, or telephone number within five days.
- Keep all appointments with service providers, RCDCS, and CASA/GAL. Advance notice and good reasons must be provided for missed appointments.

3

- Provide written authorization to release information.
- Maintain suitable, safe, and stable housing.
- Complete anger management.
- Complete counseling with Centerstone.
- Attend supervised visitations with N.S. at Centerstone.
- Engage in case management with Centerstone.

Ex. Vol. Appellee's Ex. 5A pp. 5-7. Centerstone is a mental health group with several facilities around Indiana.

At the time of this hearing, Father was recently married to K.S. ("Stepmother"). Father and Stepmother later had two daughters. Jessica Maxwell ("Maxwell"), RCDCS family case manager, also attended this hearing. Father had threatened Maxwell and was briefly incarcerated as a result. As a result of Father's threats, Maxwell obtained a protective order against Father. Thereafter, Father was incarcerated for theft between November 2010 and May 2011. Father did appear with counsel at the December 16, 2010 and April 7, 2011 periodic case review hearings. The court noted his incarceration and ordered N.S. to remain in foster care.

On July 14, 2011, Father appeared with counsel at the permanency and review hearing. While the court found Father to be somewhat compliant with the case plan, he had also not yet enrolled in counseling or parenting classes and moved to Ohio. The court ordered Father to participate and complete therapy and parenting classes. The court approved a permanency plan of reunification. On October 6, 2011 and January 12, 2012 Father appeared with counsel at the periodic review hearings. The court again ordered Father to participate in therapy and counseling.

4

RCDCS filed its Petition for the Involuntary Termination of the Parent/Child Relationship of a Child in Need of Services on February 10, 2012. At the April 17, 2012 periodic review hearing, the court found that while Father was somewhat compliant with his case plan, he was resistant and was not deriving any benefit from services. Father had not made any progress, minimal bonding was observed during his visits with N.S., and Father often slept during visits. The court discontinued services for Father.

The juvenile court held an evidentiary hearing on July 11, 2012 and July 18, 2012. Several professionals, who had attempted to assist Father, testified at these hearings. Father failed to appear in person on July 11, 2012 but was represented by counsel. Father and his counsel appeared on July 18, 2012.

Cassie Theurer ("Theurer"), a family support specialist from Centerstone, testified that she met with Father at least twenty-six times between April and October of 2010. She also visited Father in jail. She advised him that he needed to contact Centerstone after his release to arrange therapy appointments, parenting classes, and supervised visitation with N.S. Although Father was released in May 2011, he did not arrange a parenting class until October 2011.

Theurer further testified that between April 2010 and February 2012 Father responded poorly, acted in a childish manner, and failed to complete the tasks necessary to address his parenting issues. For example, during one of Theurer's observations, Father and Mother threw mashed potatoes at each other. Father once took N.S. to a doctor's appointment, but he sat in the car through the appointment. He used supervised visitation time to watch TV and play with his phone. He also slept during several

5

visitations. During one visitation, Theurer observed as Father built a fort with a table and dry erase board, crawled inside, and fell asleep. This behavior continued even after Centerstone tried to accommodate Father's work schedule. He often ignored his daughter when he was awake, even when she tried to get his attention.

Father failed to respond to safety issues. During another visitation, N.S., then two years old, started putting her fingers in the DVD player. Theurer became concerned that N.S. could possibly get her fingers caught or, worse, pull the TV down on top of her. However, Father did nothing. Father failed to notice when N.S. needed her diaper to be changed. Overall, Theurer did not observe any progress or improvement in Father's performance as a parent, attentiveness to N.S.'s cues, attention or interaction with N.S., communication with N.S., ability to soothe N.S., or his ability to correct or redirect N.S. Theurer believed that because N.S. was diagnosed with failure to thrive, Father's apathy could be especially harmful.

Taylor Stephens ("Stephens"), another family support specialist from Centerstone, started working with Father after Theurer in March 2012. Stephens supervised his visits and worked with Father on parenting classes for about a month. Twelve sessions were required to complete the parenting class curriculum. Father completed four. He did not complete the vast majority of homework. Stephens also noticed apathetic behavior during visitation and tried to work with Father to correct this issue. Mother's visits were immediately before Father's visits. Stephens repeatedly emphasized the importance of communicating with Mother regarding when N.S. had last been fed and changed. Father never asked Mother any questions between visits and would sometimes feed N.S.

6

immediately, after she had already been fed by Mother. Visitations ended in May 2012 because Father stopped coming and did not reschedule. Father told Stephens that he did not feel that RCDCS had a case against him and that N.S. should not have been removed in the first place.

Jessica Hamlyn ("Hamlyn"), an outpatient therapist, met with Father approximately twelve times between November 2011 and April 2012. Hamlyn tried to help Father comply with the court ordered tasks, obtain employment, and address anger management. During sessions with Hamilyn, Father would often try to shift the conversation to topics that made him comfortable, but that had nothing to do with the goals of the therapy. Even after Hamilyn redirected the conversation to focus on N.S., Father would talk about his other children with K.S. instead. In the week after a session, Father often did not follow up on tasks like contacting potential employers or signing up for parenting classes. Hamilyn also observed Father nodding off during visitations with N.S. Hamilyn suspected, and a doctor diagnosed Father with anti-social personality disorder. Hamlyn finally informed RCDCS that Father was not benefitting from counseling and therapy, and recommended that services be stopped.

Kathy Davis-Brutchen ("Brutchen"), the family case manager for RCDCS, began working with Father in January 2011. Based on Brutchen's observations, there was only a very limited bond between N.S. and Father. Father did not understand N.S.'s developmental needs. Brutchen observed Father ignoring N.S. during visits. Father participated minimally during family-team meetings, answering only "Yes" or "No," or ignoring the meeting altogether.

Brutchen and Debra McGriff-Tharp ("Tharp"), the child advocate, drove over an hour to Father's home in Ohio to complete a pre-arranged home visitation. This visitation was scheduled for 10:15 a.m. on a Saturday. When they arrived, Father was still in bed asleep. One of his other daughters toddled up to the door wearing a diaper that sagged to her knees. Stepmother changed the diaper. Father's other child was in a swing and remained in the swing during the entire two-hour visit. Father did not leave the bedroom until someone from across the street arrived and requested a ride. Then Father left the house for over an hour. During the entire two hour and fifteen minute visit, Father was only present for approximately thirty minutes. During this visit, Father told Brutchen he was employed, but, in fact, he had been laid off about a week before.

In April 2012, Brutchen recommended that services end because Father was resistant to services. Father also told Brutchen that he did not feel that he needed services. Brutchen testified that N.S. had a strong bond with her foster family because she had been with them since she was removed from the home in July 2010. When asked if she believes Father will change, Brutchen responded, "Father is resistant to that.. . . [H]e does not feel that he has an issue. . . . [H]e doesn't feel like he needs to participate in services. . . .[H]e's unwilling to try and learn what he needs to do to take care of his child." Tr. p. 190

Tharp, the child advocate, worked on this case since its inception. In this case, Tharp acted in a role similar to that of a Guardian Ad Litem. Tharp observed several visits. During a home visit in 2010, Tharp asked Father to give N.S. a bottle. It was a

8

stifling, hot day, and the home did not have air conditioning. Father laughed and ignored the request. Tharp emphasized that Father did not make any progress toward reunification.

On September 4, 2012 the juvenile court issued an Amended Order on Fact-Finding Hearing terminating parental rights. Father now appeals.

**Discussion and Decision**

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Where, as here, the juvenile court enters findings of fact and conclusions of law in its termination of parental rights, our standard of review is two-tiered. In re J.H., 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), trans. denied. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. In re C.G., 954 N.E.2d 910, 923 (Ind. 2011). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. C.G., 954 N.E.2d at 923.

The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. Id. However, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a request to terminate parental rights. In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. Id.

A request to terminate a parent's rights is not made lightly, and before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257,

10

1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## I.    Removal of Child

On July 30, 2010, N.S. was removed from Mother's home. Father argues that because he was no longer living with Mother, he does not believe that N.S. was removed from him. Father specifically draws from Findings of Fact 8, 13, and 20:

8.    Juvenile was removed from her parents under an Emergency Custody Order on July 30, 2010.

13.   Juvenile was removed from the parents under the Dispositional Order entered September 29, 2010.

20.   Juvenile was removed from Mother and Father in July 2010.

Appellant's App. pp. 8-9. Father argues that Finding 205 contradicts Findings 8, 13, and 20:

205.   Father was not in the home when the CHINS case was filed, as he had left the home a few days prior.

Id. at 20.

A similar argument was raised in Tipton v. Marion County Department of Public Welfare, 629 N.E.2d 1262 (1994). In Tipton, two children with different fathers, but the same mother, were removed from their mother's home. The two fathers argued that their children were removed from mother, but not from them. This court found that,

"The fathers did not have physical custody of the children when they were removed. Nonetheless, the children were effectively removed from both of their parents when they were removed from the physical custody of the mother and placed in another home pursuant to the modified dispositional decree of July 26, 1990. Accordingly, we conclude that the trial court did

11

not err in finding that the children had been removed from their fathers for a period of at least six (6) months under a dispositional decree."

Id. at 1266.

Similarly, N.S. was removed from Father on July 30, 2010. Father was present in the household during three of the four reports to RCDCS. Father was involved in the Informal Adjustment. He was still living in the home when doctors diagnosed N.S. with failure to thrive. We are unconvinced by Father's argument that N.S. was removed solely because of Mother's negligence. If Father was an apparently acceptable caregiver, RCDCS was required to place N.S. with him before placing her in foster care. Indiana Code section 31-34-4-2.

## II.  Conditions Remedied

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. See L.S., 717 N.E.2d at 209. Because we find it to be dispositive, we limit our review to Father's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether RCDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of S.B. outside Father's care will not be remedied.

When making a determination as to whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of

12

changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, RCDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, RCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. In re E.S., 762 N.E.2d 1287 (Ind. Ct. App. 2002). Moreover, we have repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." Castro v. State Office of Family & Children, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), trans. denied.

This case began in February 2010 when N.S. was almost two months old, and Father and Mother were still living in the home. After N.S. was initially removed from

13

the home, RCDCS entered into an Informal Adjustment with Mother and Father, N.S. was returned to the home, and services were provided. In essence, Mother and Father were given a second opportunity to both learn and demonstrate better parenting practices. RCDCS provided substantial support to assist both parents in achieving this goal. Instead of demonstrating better parenting practices, Father demonstrated immature behavior and simply went through the motions of the program. He took his daughter to doctor appointments, but did not go in. He threw mashed potatoes at Mother. He refused to give his daughter a bottle even in stifling temperatures. Finally, he did not comply with the terms of the Informal Adjustment.

When N.S. was removed from the home again on July 30, 2010, Father was offered a third opportunity to learn and demonstrate better parenting practices. During this third period of services, Father was incarcerated two different times: once for threatening a caseworker and once for theft. Father moved over sixty miles away from N.S., out of state. Again, he went through the motions of the program. He would show up but ignore his daughter or sleep. He would attend parenting classes but would not complete the homework. He would attend counseling but would not follow suggestions like completing resumes and contacting schools. He refused to communicate with Mother to the detriment of N.S. When two caseworkers drove over sixty miles to his home in Ohio for a pre-arranged home visit, Father remained in the bedroom and then left the house for most of the visit. Over the course of the reunification services, at least six different professionals attempted to work with Father to help him become a better parent.

No professional noted any significant improvement in Father, even after thirty months of services.

Based on these and other findings, the trial court concluded that there is a reasonable probability that the conditions that resulted in the removal and continued placement of N.S. outside of Father's care will not be remedied.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. A thorough review of the record leaves us satisfied that clear and convincing evidence supports the trial court's findings, and these findings, in turn, support the court's ultimate decision to terminate Father's parental rights to N.S. RCDCS presented clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability that the conditions leading to N.S.'s removal and/or continued placement outside of Father's care will not be remedied.[1] Father's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265.

## Conclusion

RCDCS presented clear and convincing evidence to support the juvenile court's findings and ultimate determination that N.S. was removed from Father's care and there

---

[1] For these same reasons, we reject Father's claim that N.S. was removed from Father's care for the sole reason that her foster parent's home was superior to Father's.

15

is a reasonable probability that the conditions leading to N.S.'s removal or continued placement outside Father's care will not be remedied.

Affirmed.

BAKER, J., and MAY, J., concur.