# FOR PUBLICATION



FILED

Sep 05 2014, 9:02 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JERRY T. DROOK**
Grant County Public Defender's Office
Marion, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF B.W. and A.K., ) | |
| Alleged to be Children in Need of Services, ) | |
| ) | |
| A.C. (Mother), ) | |
| ) | |
| Appellant-Respondent, ) | |
| ) | |
| vs. ) | No. 27A05-1401-JC-29 |
| ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, ) | |
| ) | |
| Appellee-Petitioner. ) | |

APPEAL FROM THE GRANT SUPERIOR COURT
The Honorable Dana J. Kenworthy, Judge Pro Tempore
Cause Nos. 27D02-1110-JC-705 and 27D02-1110-JC-706

**September 5, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

A.C. ("Mother") appeals the trial court's orders appointing guardians over her children, A.K. and B.W., following a permanency hearing. Mother presents a single issue for our review, namely, whether the trial court abused its discretion when it appointed guardians over the children. We reverse and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

Mother has two children: A.K., born January 19, 2009, and B.W., born January 25, 2011.[1] On approximately September 29, 2011, Mother observed that B.W.'s right arm was swollen. On October 4, Mother took B.W. to her pediatrician, who ordered x-rays, which revealed a fracture. B.W. was referred to Peyton Manning Children's Hospital, and one of her health care providers there concluded that B.W.'s injury was not accidental. B.W. was also diagnosed with four other fractures that "were in different stages of healing, indicating that they may have occurred on more than one occasion." Appellant's App. at 273. Dr. Cortney Demetris concluded that the injuries had been caused by child abuse.

Dr. Demetris found it "exceptionally difficult to get a medical history from Mother" and observed that Mother "did not appear remorseful or upset that [B.W.] was injured." Id. Mother and her boyfriend, D.B., were the sole caretakers of B.W. and A.K. When asked about how the injuries occurred, Mother "was inconsistent with her explanation of details." Exs. Vol. at 30. Mother stated that she had "left the children in the care" of D.B. while she attended night school, and D.B. denied having hurt B.W. Id.

---

[1] The children have two different fathers, neither of whom participates in this appeal.

The Department of Child Services ("DCS") removed both children from Mother's care and placed them in foster care.

On October 24, DCS filed petitions alleging that the children were children in need of services ("CHINS") and the trial court appointed a Guardian ad Litem; on November 14, Mother married D.B.; and on December 16, the trial court found the children to be CHINS and ordered that the children be placed with their maternal great uncle and great aunt. On April 26, 2012, during a fact-finding hearing, Mother and D.B., who DCS named as a custodian of the children in an amended petition, stipulated that B.W. received injuries that would not have occurred but for the act or omission of a parent or custodian and that "there is no adequate explanation for such injuries." Appellant's App. at 91. Thus, Mother and D.B. stipulated that the children were CHINS.

Following another hearing, on May 24, the trial court entered a dispositional order, which prohibited D.B. from having any contact with the children and which set out a parental participation plan for Mother consisting of twenty-two requirements, including a parenting assessment, a psychological evaluation, and individual therapy. The purpose of the parental participation plan was to reunify Mother with the children.

On June 6, D.B. moved the trial court to dismiss him from the CHINS proceedings because he had filed for dissolution of his marriage to Mother. The trial court granted that motion. And at the end of June 2012, the children were separated from each other and placed with different relatives. B.W. was placed with her paternal aunt and uncle, S.L. and B.L. And A.K. was placed with his father, E.K., and E.K.'s mother, H.K., who live in Ohio.

In October 2012, Laurel Tinsley, a Family Behavioral Specialist with Grant-Blackford Mental Health who was acting as Mother's home-based case manager, wrote a progress report and stated that Mother had been "attending therapy with Tonya Scalf on a weekly basis" and Scalf had reported to Tinsley that Mother "is very insightful in therapy and is making significant progress." Appellant's App. at 179. Tinsley also reported that Mother was doing "a wonderful job of applying the skills she is learning in home-based services to her interactions with her children during supervised visits." Id.

In a progress report also dated October 2012, DCS family case manager Michelle Lane stated that Mother

> has been actively participating in weekly visitation, counseling and Home-Based services. Both service providers report [Mother] seems to be progressing and actively participating during her appointments. DCS believes she is getting the right tools during these appointments, but is unsure if she is using these skills.
>
> [Mother] has made poor choices in the past that ha[ve] put her children's safety in jeopardy and allowed them to be neglected. DCS is concerned these type of decisions may continue. [Mother] has not been open with DCS and has been very upset when she is asked to explain what is going on in her life. She has also expressed being upset with service providers and CASA at times when they have asked her questions. DCS is concerned she is still making bad decisions and this is why she [is] not being up front with everyone.

Id. at 177.

In December 2012, Tinsley submitted a progress report stating that Mother was continuing to make good progress in therapy with Scalf and in learning home-based services. And in January 2013, case manager Lane submitted a progress report stating that Mother had obtained a new apartment that was "very clean and appropriate" and Mother continued regular supervised visits with the children. Id. at 208. Lane also noted

that Mother was in full compliance with the parental participation plan.  But Lane stated that Mother had

> changed her story [regarding B.W.'s injuries] from what she reported to DCS, law enforcement, and medical personnel during interviews.  Medical personnel reported [Mother's] story did not match with [B.W.'s] injuries.  [Mother] is now reporting [B.W.'s] father was caring for her, but did not initially report this to anyone.  The time frame of when she is reporting [B.W.'s father] cared for [B.W.] does not seem to match when medical professionals believe the injuries occurred.  DCS is still unaware of who hurt [B.W.] and if [Mother] can or will keep her children safe.

Id. at 210.  Finally, Lane stated that "DCS would ask the court to allow a change in the permanency plan [from reunification with Mother] to termination of parental rights because the children will be out of the home for 15 out of 22 months."  Id. at 209.

Despite DCS's request to change the permanency plan to termination of parental rights, in February 2013, following a hearing, the trial court entered an order approving a permanency plan that states in relevant part as follows:

> The Court believes that Mother has lied about the injuries to [B.W.]  Mother has given multiple versions.  The Court was concerned during today's hearing about Tonya Scalf, Mother's therapist, becoming emotional during her testimony which leads to concern regarding Ms. Scalf's objectivity.
>
> The Court is further concerned about Mother's reasons given for not taking a polygraph regarding the injuries to [B.W.]  Mother's reasons were all regarding Mother's own issues, for example, Mother's emotional stress.  The Court believes Mother is still protecting a man by not disclosing what she knows about [B.W.'s] injuries.
>
> After hearing all the evidence, recommendations and argument, the Court accepts DCS' recommendation to continue services and efforts to reunify children with Mother.  However, [A.K.] shall remain placed with his grandmother, [H.K.]
>
> The Court, reluctantly, authorizes DCS to increase Mother's parenting time with the children, as appropriate.

5

Id. at 229 (emphasis added).

In April 2013, Lane submitted a progress report to the trial court and stated that Mother was in full compliance with the parental participation plan. But Lane noted that

> DCS is concerned with [Mother's] decisions and lack of honesty during the life of this case. She has told at least four different stories of whom [sic] and how she believed her daughter, [B.W.], was harmed. Initially, she reported that she believed [B.W.] had to have been hurt in her boyfriend [D.B.'s] care. She quickly changed this story and began stating her two year old son had pulled a toy away from her daughter. [Mother] then began telling DCS and service providers that [B.W.] was hurt by her father, [J.W.] She continued to tell this story for a year despite telling DCS and medical professionals [B.W.] had not been in [J.W.'s] care during the time-frame of her injuries. [Mother] has recently began saying she does not know who harmed her child. DCS is concerned about [Mother's] change in story despite the timeline she originally gave to DCS, law enforcement, and medical personnel. We still have no idea who has harmed [B.W.] [Mother] is refusing to take a recommended therapeutic polygraph to determine history, if she harmed [B.W.] or if she has any knowledge of what happened to [B.W.]
>
> [Mother] married her boyfriend, [D.B.], approximately a month after becoming involved with DCS. She married him after agreeing with DCS that [D.B.] would not have any contact with her children. After [Mother's] husband divorced her she began thinking about returning to school and moving out of the area. She began considering moving in with a man and attending Huntington College. [Mother] later decided this would not be a good option after discussing it with service providers. DCS has no knowledge if [Mother] has continued any further relationship with [D.B.] or any other male.
>
> * * *
>
> DCS continues to express concerns to [Mother] about the safety of her children. [Mother] continues to focus on the trauma in her life and herself as a victim. She does not seem to express the same concern for her children and their safety. DCS does recognize that [Mother] has strengths and has made progress with her own health, but she does not seem to understand any of the concern that no one has any knowledge of who harmed [B.W.]

6

Id. at 241, 243. And Lane stated that DCS recommended changing the permanency plan for both children from reunification to appointment of a legal guardian for each child.

Also in April 2013, Scalf wrote a letter to Lane and stated in relevant part as follows:

> [Mother] has continued to come prepared to address issues related to her past relationship choices, addressing her depression and her anxiety, working on coping with past mistakes and planning for the future. Although [Mother] still denies knowledge of how the injuries occurred to her daughter, she has talked more about the possibilities of [D.B.] being responsible for the injuries. She has wondered and questioned some of the events that happened during that time period. Her unanswered questions combined with the stress of the last court hearing, addressing issues from her past and being worried about the welfare of her children, have increased her anxiety during the past few months. Which has led to a medication change by Donna (Rene) Spears, APN; Trazodone was added to the Wellbutrin. [Mother] appears to be tolerating the medications well with no side effects and is continuing to follow up with Donna (Rene) Spears, APN as recommended.
>
> [Mother] has continued to maintain her employment, her apartment and a functional vehicle. She is still coping with issues of grief and loss over the passing of her mother and grandmother and has also been worried about her sister who recently had her engagement broken off. During the past month, she also had several visitations canceled with her son, which led to increased worries and anxiety. With the increased family stress, [Mother] has had increased insomnia during the past few months. She was struggling with feelings of loneliness at nighttime and would go to her father's home some evenings to avoid being alone. With the adding of the Trazodone and working on relaxation skills, [Mother] is resting more peacefully and reporting that she is getting a more sound sleep at night.
>
> Her anxiety still tends to be high; [Mother] constantly talks of her children and their welfare. She has been addressing parenting issues in therapy, discussing how to be protective and provide safety for her children, not only as children but also talking about as they get older into their teens. She addresses questions about how to maintain age appropriate and positive conversation with her children. She will ask questions about trusting others to be around her children, including their friends as they get older and whether or not to let them go to friends' homes.

> [Mother] continues to be active in the therapeutic process; she has insight and take[s] ownership of her past mistakes. She continues to be consistent in therapy and has shown maturity in the course of her treatment. She is also continuing to meet with her mother mentor. The impression of this therapist remains that [Mother] has taken ownership for past poor judgment and has grown from this experience of working with [DCS], home-based services and therapy.

Id. at 245-46. Tinsley also wrote a letter stating in relevant part that Mother continued to do a "wonderful job of applying the skills she is learning in home-based services to her interactions with her children during the supervised visits." Id. at 247. Tinsley observed that

> [Mother] is very playful and creative with her children during the visits. [Mother] plans out activities to do with her children and provides a meal during the visit. [Mother] is nurturing and affectionate with her children. [Mother] has a strong bond with both of her children [as] evidenced by the children's desire to constantly be held by her. Since the last court hearing on February 14, 2013, I have begun partial unsupervised visits with [Mother] and her children. [Mother] has had three partial unsupervised visits with her children so far. There have been no concerns observed during the visits. [Mother] provides a safe environment for her children.

Id. at 248.

On October 29, 2013, the trial court held a permanency hearing. And on December 20, the trial court entered an order appointing guardians for the children. The trial court found and concluded in relevant part as follows:

> 8.    Mother has given several contradictory statements related to [B.W.'s] injuries during the life of the CHINS case. Mother delayed seeking medical care for [B.W.]  She has blamed [B.W.'s] father, her boyfriend [D.B.], and [B.W.'s] two-year-old brother, [A.K.], for the injuries. Mother married [D.B.] after the CHINS case was filed, and has since divorced him. Mother has been unwilling to take a therapeutic polygraph, stating that she does not believe in polygraphs (the Court notes that Mother was not ordered by the Court to take the polygraph). To date, the specific cause of [B.W.'s] injuries remains unexplained. This is of great concern to the Court.

8

* * *

12. Although Mother has completed a number of court-ordered services, the Court notes that her body language, attitude and demeanor in Court, as well as the substance of her most recent testimony evidences a continued self-centered way of thinking, and inability or unwillingness to put her children's interests and needs before her own. Mother continues to appear before the Court with the mien of a victim of "the system," and this position has been reinforced by some of her family members and support system. This, in conjunction with the as-yet unexplained cause of [B.W.'s] injuries, gives the Court great concern about [B.W.'s] safety if she were returned to Mother's care.

13. The CASA for [B.W.] has served on this case since May 22, 2012, and has conducted a thorough investigation regarding the well-being of [B.W.], including among other things, visiting with [B.W.], observing visits, observing and participating in hearings, reviewing DCS' records, medical records, and other evidence. CASA testified that she continues to have concerns that [B.W.] would not be safe in Mother's care. The Court finds CASA's testimony to be credible and her conclusions to be rationally based upon the evidence in this case.

Id. at 273-74.[2] This appeal ensued.

## DISCUSSION AND DECISION

Indiana Code Section 31-34-21-7 provides in relevant part that when the trial court holds a permanency hearing in a CHINS proceeding it shall make the determination and findings required by Indiana Code Section 31-34-21-5, which provides:

(a) The court shall determine:

(1) whether the child's case plan, services, and placement meet the special needs and best interests of the child;

(2) whether the department has made reasonable efforts to provide family services; and

(3) a projected date for the child's return home, the child's adoption placement, the child's emancipation, or the

---

[2] The trial court entered substantively similar orders pertaining to each child.

9

appointment of a legal guardian for the child under section 7.5(c)(1)(E) of this chapter.

(b) The determination of the court under subsection (a) must be based on findings written after consideration of the following:

(1) Whether the department, the child, or the child's parent, guardian, or custodian has complied with the child's case plan.

(2) Written documentation containing descriptions of:

(A) the family services that have been offered or provided to the child or the child's parent, guardian, or custodian;

(B) the dates during which the family services were offered or provided; and

(C) the outcome arising from offering or providing the family services.

(3) The extent of the efforts made by the department to offer and provide family services.

(4) The extent to which the parent, guardian, or custodian has enhanced the ability to fulfill parental obligations.

(5) The extent to which the parent, guardian, or custodian has visited the child, including the reasons for infrequent visitation.

(6) The extent to which the parent, guardian, or custodian has cooperated with the department.

(7) The child's recovery from any injuries suffered before removal.

(8) Whether any additional services are required for the child or the child's parent, guardian, or custodian and, if so, the nature of those services.

(9) The extent to which the child has been rehabilitated.

(10) If the child is placed out-of-home, whether the child is in the least restrictive, most family-like setting, and whether the child is placed close to the home of the child's parent, guardian, or custodian.

(11) The extent to which the causes for the child's out-of-home placement or supervision have been alleviated.

(12) Whether current placement or supervision by the department should be continued.

(13) The extent to which the child's parent, guardian, or custodian has participated or has been given the opportunity to participate in case planning, periodic case reviews, dispositional reviews, placement of the child, and visitation.

(14) Whether the department has made reasonable efforts to reunify or preserve a child's family unless reasonable efforts are not required under section 5.6 of this chapter.

(15) Whether it is an appropriate time to prepare or implement a permanency plan for the child under section 7.5 of this chapter.

In In re Guardianship of B.H., 770 N.E.2d 283, 287-88 (Ind. 2002), our supreme court set out the applicable standard of review:

Despite the differences among Indiana's appellate court decisions confronting child placement disputes between natural parents and other persons, most of the cases generally recognize the important and strong presumption that the child's best interests are ordinarily served by placement in the custody of the natural parent. This presumption does provide a measure of protection for the rights of the natural parent, but, more importantly, it embodies innumerable social, psychological, cultural, and biological considerations that significantly benefit the child and serve the child's best interests. To resolve the dispute in the case law regarding the nature and quantum of evidence required to overcome this presumption, we hold that, before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. The presumption will not be overcome merely because "a third party

11

could provide the better things in life for the child." Hendrickson[ v. Binkley, 161 Ind. App. 388, 396, 316 N.E.2d 376 (1974)]. In a proceeding to determine whether to place a child with a person other than the natural parent, evidence establishing the natural parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would of course be important, but the trial court is not limited to these criteria. The issue is not merely the "fault" of the natural parent. Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person. This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review. A generalized finding that a placement other than with the natural parent is in a child's best interests, however, will not be adequate to support such determination, and detailed and specific findings are required. [In re Marriage of Huber, 723 N.E.2d 973, 976 (Ind. Ct. App. 2000)].

"In deference to the trial court's proximity to the issues, 'we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment.'" Oil Supply Co., Inc. v. Hires Parts Serv., Inc., 726 N.E.2d 246, 248 (Ind. 2000) (quoting Chidester v. City of Hobart, 631 N.E.2d 908, 910 (Ind. 1994) (citing Indianapolis Convention & Visitors Ass'n v. Indianapolis Newspapers, Inc., 577 N.E.2d 208 (Ind. 1991))). We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Id. A challenger thus labors under a heavy burden, and must show that the trial court's findings are clearly erroneous. Ind. Trial Rule 52(A); Chidester, 631 N.E.2d at 909-10. Child custody determinations fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion. Clark v. Clark, 726 N.E.2d 854, 856 (Ind. Ct. App. 2000). Reversal is appropriate only if we find the trial court's decision is against the logic and effect of the facts and circumstances before the Court or the reasonable inferences drawn therefrom. Id. We also note that, in reviewing a judgment requiring proof by clear and convincing evidence, an appellate court may not impose its own view as to whether the evidence is clear and convincing but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence. See Bud Wolf Chevrolet, Inc. v. Robertson, 519 N.E.2d 135, 137 (Ind. 1988).

Mother contends that the trial court's conclusion that the appointment of guardians over the children is in the children's best interests is clearly erroneous. In particular, Mother asserts that the trial court's findings do not support its conclusion that guardians should be appointed over the children

> simply because [Mother] has not agreed to take a polygraph examination as to how her daughter was injured, and has not convinced the trial court nor CASA that she doesn't know what happened to her daughter. <u>Throughout the CHINS proceedings, there was an undercurrent of suspicion that [Mother] knows more than she is telling</u> about the injuries to B.W. However, not one person has posited or alleged that [Mother] herself had injured the child.

Appellant's Br. at 17-18 (emphasis original).

Indeed, the evidence is undisputed that Mother has successfully completed every requirement of the twenty-two part parental participation plan ordered by the trial court in May 2012. Mother's home-based case manager, Tinsley, and Mother's therapist, Scalf, have consistently reported Mother's progress throughout the proceedings and both recommended that Mother be reunited with the children. At the guardianship hearing, the only evidence presented by DCS in favor of the guardianship was Mother's unwillingness to take a polygraph examination or otherwise divulge information she may know about how B.W. was injured in 2011. Lane and the CASA both testified that Mother was unable to provide a safe home for the children, but when asked to explain what that meant, they each stated only that Mother needed to take a polygraph examination and to explain how B.W. was injured. In particular, Lane testified as follows:

Q: Ma'am, you indicated that reunification efforts with mother failed. Is that correct?

A: Correct.

Q:     What services did [Mother] fail to complete?

A:     She worked—she did not fail to complete any services.

Q:     She successfully completed every service put before her, correct?

A:     Correct.

* * *

Q:     Okay.  What additional steps does [Mother] need to take in order to have the children back in her care?

A:     I would say that she would have to provide that she can show a safe home.

Q:     Uh-huh.

A:     It took several months for her to come up with a safety plan for her children.  After she told our department that there were people who weren't appropriate to watch her children, her first safety plan she put those people in the plan and then she also refuses to take a therapeutic polygraph because we have question to whether [sic] who harmed the children.

Q:     Do you have any question that [Mother] harmed the children?

A:     I don't know.

Q:     You don't know?

A:     I don't know if she harmed the children.  I don't.  I wasn't there.

Q:     Has there ever been a suggestion throughout the history of this case that [Mother] was the one that harmed the children?

A:     No, but I do not know that.

Q:     You indicated that [Mother] needs to show that she can provide a safe home.  Is that correct?

A:     Correct.

Q:     What about [Mother's] home currently is not safe?

14

A: Because she has not been able to prove that she can provide a safe home to, for her children.

Q: What does she need to do other than what she's doing to prove that she has a safe home?

A: I would recommend that she take the therapeutic polygraph and come up with a safe plan for her children.

Q: So the polygraph will show that she has a safe home?

A: The polygraph will help to determine if there's any indicators of violence, if she had any knowledge of what happened to her children, if she has ever harmed her children.

Q: Uh-huh. She took a parenting assessment. Is that correct?

A: Correct.

Q: She also took a psych[ological] eval[uation]. Is that correct?

A: Correct.

Q: Did either of those indicate violence in [Mother]?

A: No.

Q: Did either of those raise any concerns of risk for the children's safety in her care?

A: No.

Tr. at 15-17.

And the CASA testified in relevant part as follows:

A: . . . I have watched [Mother] as a mother. She knows how to care for both her children, but at the time they were living with her, she did not provide a safe environment.

* * *

Q: In regards to [Mother], what changes would you need her to make in order to recommend that [the children] be back with her?

15

A:   I'll go back to the polygraph. I want to know how [B.W.] got five fractures and was only seen one time by a doctor and that was the last time with the broken arm. When they, when [B.W.] was taken to Peyton Manning Hospital, they, that was a suspicion right away that that was not an accidental breakage.

Q:   Uh-huh.

A:   And so they took further x-rays and evaluated and there were five, four additional breaks and she was never seen by a doctor for the other breaks, so I question, you know, what was happening? Where was the mother at that time?

Q:   Uh-huh.

A:   So that, you know, [B.W.] was not in a safe place and neither was [A.K.] and [D.B.] was just not the proper person to be there babysitting for her, but she had no one else to babysit evidently. I mean, I don't know where her family was at that time.

Q:   Agreed. Fast forward 16 months. Is [Mother] with . . . [D.B.]?

A:   No.

Q:   Is [Mother] in any interpersonal relationship with a man?

A:   Not at the moment.

Q:   Does [Mother] work?

A:   Yes.

Q:   Does [Mother], has [Mother] provided a plan for who would care for the children if she's at work and she has the children with her?

A:   She has. Yes.

Q:   And does that plan involve individuals that have already been approved by DCS to be safe caregivers for these children?

A:   Yes.

Q:   Have there been any concerns raised to you about [Mother's] ability on a daily basis to care for [the children]?

16

A:      I just wonder how she—it would be if she was working especially if she went into two jobs and was going to school, who was going to be caring for the children, how was she going to be able to handle all that? That is a lot with two children, you know, in school, games, whatever, you know. I mean, and then having to be part of, you know, visits with [A.K.] and his family. That, you know, I question whether she could handle all that.

Q:      And that's different from the life of any single mother of two how?[3]

A:      No, that's, that's, that's what it's like with a family with children and a mother working. Yes, it is difficult.

Q:      Any indication from any of the service providers since the beginning of this case that [Mother] is incapable of doing exactly those things that you just talked about?

A:      Not from the providers. No.

Id. at 65, 68-69.

We agree with Mother that the trial court's conclusion, that the appointment of guardians over the children is in the children's best interests, is clearly erroneous. First, it is well settled that polygraph examinations are notoriously unreliable. See, e.g., Hubbard v. State, 742 N.E.2d 919, 923 (Ind. 2001) ("'Although the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams.'") (quoting United States v. Scheffer, 523 U.S. 303, 312 (1998)). Mother's refusal to take a polygraph examination is, therefore, justified. Further, as the trial court noted in its

_____

[3] The CASA's remarks that she doubted that Mother would be able to juggle school, work, and motherhood are not persuasive. Indeed, the CASA ultimately conceded that, while "it is difficult" for any working mother, the evidence shows that Mother is capable of caring for the children while attending to school and work. Tr. at 69. As Mother's counsel's question suggests, if the CASA's opinion were credited, it would implicate any single, working parent in Indiana.

17

findings, the court did not require Mother to take a polygraph examination as part of her parental participation plan. Thus, DCS's assertion that Mother's refusal to take a polygraph demonstrates that she is incapable of providing a safe home for the children is unfounded.

Second, while Mother challenges the trial court's order on permanency and not the underlying CHINS determination, we find the following appropriate to the issue on appeal: It is well established that "a CHINS adjudication may not be based solely on conditions that no longer exist. The trial court should also consider the parents' situation at the time the case is heard." In re R.S., 987 N.E.2d 155, 159 (Ind. Ct. App. 2013). Here, as the CASA's testimony illustrates clearly, DCS has been focused solely on understanding how B.W. was injured and the conditions that existed at the time of the children's removal from Mother's custody. DCS presented no evidence to demonstrate any conditions existing at the time of the final permanency hearing to justify the permanent removal of the children.

Moreover, this is not a case where a parent has made an eleventh-hour effort to show compliance with a parental participation plan. The undisputed evidence shows that Mother has consistently demonstrated her eagerness to learn how to be a better parent and to gain insight into her past mistakes. And there is no dispute that Mother complied with and satisfied every condition of the permanency plan, the purpose of which was to reunify Mother with the children. DCS, and, by extension, the trial court, wholly ignore this undisputed evidence and instead suggest that Mother's past mistakes dictate her future. We hold that DCS has not presented clear and convincing evidence to show that

18

Mother's failure to explain how B.W. was injured, absent evidence that Mother can do anything more than speculate on the cause, trumps Mother's successes in all ordered aspects of these CHINS proceedings.

Mother's present ability to provide a safe home for her children is shown by her full compliance with the parental participation plan, which was designed with the goal of reunification, and positive recommendations by Tinsley and Scalf. Even the CASA reported that Mother is a good parent to the children. And, as Lane acknowledged, Mother's parenting assessment and psychological evaluation showed no indication of violent tendencies. D.B., whom DCS and the trial court suspect caused B.W.'s injuries, had been out of Mother's life for well over a year by the time of the guardianship hearing. And, again, the undisputed evidence shows that Mother has gained insight into her past bad choices in relationships with men.

In sum, there is simply no clear and convincing evidence that the children would be in any danger if they are reunited with Mother. Mother's failure to explain the cause of B.W.'s injuries is not evidence of a present inability to provide a safe home for the children. While the undisputed evidence shows that the children are bonded and thriving with their guardians, and while they have been placed outside of Mother's home since 2012, Mother has consistently visited with the children, and DCS has presented no evidence to show anything other than a strong family bond between Mother and the children. Again, there is a presumption that a child's best interests are ordinarily served by placement in the custody of the natural parent. B.H., 770 N.E.2d at 287. And "[t]he

presumption will not be overcome merely because 'a third party could provide the better things in life for the child.'" Id. (quoting Hendrickson, 161 Ind. App. at 396).

DCS has not presented clear and convincing evidence that Mother is currently unable to provide a safe home for the children or that the guardianships are in the children's best interests. We hold that the trial court abused its discretion when it appointed guardians for the children. We reverse the trial court's judgment and remand with instructions that the court reunite the children with Mother.

Reversed and remanded with instructions.

BAILEY, J., and PYLE, J., concur.