

ATTORNEY FOR APPELLANT

Linda L. Harris
Kentland, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

K.T. (Minor Child)

and

D.T. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 19, 2019

Court of Appeals Case No.
19A-JT-1528

Appeal from the Jasper Superior Court

The Honorable Russell D. Bailey, Judge

Trial Court Cause No.
37D01-1803-JT-42

**Bailey, Judge.**

# Case Summary

[1] D.T. ("Father") appeals the trial court judgment terminating his parental rights to K.T. ("Child"), born January 8, 2015. On appeal, Father challenges the sufficiency of the evidence to support the trial court's conclusions that he was unlikely to remedy the reasons for Child's removal from the home and he was a threat to the well-being of Child.

[2] We reverse.

# Facts and Procedural History

[3] H.B. ("Mother")[1] and Father, biological parents of Child, were never married but Father established his paternity of Child. Child lived with Mother, who was the sole custodian. The Indiana Department of Child Services ("DCS") received information that Child had sustained various injuries—including black eyes, multiple bruises, and a second-degree burn—while in Mother's care over the period of December 23, 2016, to January 13, 2017. In a report dated December 29, 2016, DCS found that the allegations of neglect by Mother were substantiated, although the allegations of physical abuse were not. DCS found the allegations of neglect and/or physical abuse by Father were unsubstantiated. The DCS report also noted that Mother was Child's "sole caregiver[,]" and Child had not been in Father's care during the time period

---

[1] Mother voluntarily relinquished her parental rights to Child and does not participate in this appeal.

Child sustained injuries. Ex. at 101. DCS removed Child from Mother on January 13, 2017, and filed a petition alleging Child was a Child in Need of Services ("CHINS").

[4] A parenting assessment of Father, completed on March 14, 2017, recommended his participation in the Father's Engagement program so that he could "learn about his legal rights as a parent as well as his legal options for gaining regular parenting time or pursuing joint or sole physical custody should [Mother] reunify with [Child] at the end of this case and begin denying visitation again." *Id*. at 6. The assessment also recommended individual therapy to help Father "further address his anger," although it noted that his "anger is understandable" given that this was the second CHINS case initiated while Child was in Mother's care.[2] *Id*. The assessment recommended visitation with Child to "be moved to unsupervised if no issues are seen in [Father's] parenting." *Id*. at 7.

[5] Child was adjudicated a CHINS on April 11, 2017. Father appeared at the CHINS detention hearing, initial hearing, and fact-finding hearing. The CHINS court entered a dispositional order on May 9, 2017, in which it found that "participation by the parent, guardian, or custodian in the plan for the child is necessary to: achieve reunification of the family." *Id*. at 113. The court

---

[2] On September 20, 2016, DCS had investigated allegations of physical abuse of Child while in Mother's care, but that case was "[d]ismissed" on November 28, 2016. Ex. at 1

ordered that Child would remain in out-of-home placement and both parents must participate in specified services.

[6] In an order dated February 28, 2018, the trial court changed Child's permanency plan from reunification to termination of parental rights ("TPR") and adoption. The order noted that Father "has partially complied with the child's case plan. The father has recently beg[u]n participating in services." Ex. at 120. On March 13, 2018, DCS filed a petition for involuntary termination of Mother's and Father's parental rights to Child. Mother filed a voluntary relinquishment of her parental rights, and the court held the TPR fact-finding hearing on August 13, 2018.

[7] At the fact-finding hearing, various service providers and DCS workers testified that Father had failed to fully comply with services. They also testified that he had initially missed approximately four months of visitation with Child—from September through December of 2017—in order to attend the Little League baseball games of his son, B.T., over whom he shared custody with his son's mother. However, since January of 2018, he had attended approximately eighty percent of the visitations. The service providers and DCS workers also noted Father had some issues with anger and alcohol use. DCS family case manager ("FCM") Erin Smith testified that she believed termination of Father's parental rights was in Child's best interests. Donna Besse ("Besse"), the Family Focus caseworker who supervised visitations, and Amy Collier, Child's therapist, testified that Father and Child had failed to "bond." *Tr.* at 59, 69-70. Besse's visitation reports, admitted as Exhibit 6, also reported "no bond"

between Child and Father. Ex. at 59. Those reports also showed that, during the last three months of visitation, Child sat on Father's lap, played with Father, hugged Father, and tickled Father. During visits in April of 2018, Child called Father "Dad" and brought Father things she had made for him. *Id.* at 67-70. Besse's visitation reports noted that Father kissed and hugged Child, told Child he loved her, played with Child, and consistently tried to interact with Child. Nevertheless, in her most recent report, Besse characterized the visits as "destructive" because Father "takes on a role of friend during visits, … sets no limits and/or guidance, … is unaware of appropriate expectations for [Child], … comes and goes [throughout] the visit for various reasons, … put[s] his needs before [Child's], … does not provide a snack for her[,] and shows her no empathy." *Id.* at 54.

[8] The Court Appointed Special Advocate ("CASA"), Renee Conley, who had attended some of the supervised visits with Child, testified that she did not believe termination of Father's parental rights was appropriate because, although visits with Child had "progressed well," the visitation supervisor's interference with Father's parenting of Child and her "personality conflict" with Father had hindered further progress. Tr. at 109, 113. The CASA testified that it is "important to [Child] to have the ability to get to know her dad without interference" from the visitation supervisor. *Id.* at 114.

[9] Father testified that he owned his own home and had joint custody of his son. He stated that he missed some services appointments and visitations due to his work schedule and because he was responsible for taking his son to his Little

League baseball games. Father stated he had conflicts with the supervisor of the visitations because he felt that she interfered too much with his parenting of Child. Father testified that he had tried, unsuccessfully, to reschedule some of the missed appointments and visitations. Father testified he had worked full-time for the last nine years and had to travel often in his job. He testified he had recently increased his visits with Child because he had changed jobs so that he "could try to win custody" of Child. *Id.* at 98.

[10] On June 3, 2019,[3] the trial court granted the TPR petition and found in relevant part as follows:

* * *

The minor child was residing with Mother as the sole provider of custody before being detained by CPS.[4] CPS received information that minor child was reported to have sustained injuries including two severe black eyes, multiple bruises, a second degree burn to her hand, and multiple scratches to her face and lower back. These injuries occurred while in Mother's care at various intervals over a period of December 23, 2016[,] to January 13, 2017. In investigating the reports, the injuries were possibly consistent with Mother's story, but Mother failed to report the new injury to the caseworker and delayed getting medical treatment for the Minor Child and there were concerns of physical abuse. The Minor Child was detained by CPS on

---

[3] We note that the TPR Order was issued approximately ten months after the TPR hearing, and we can find no explanation for the delay in the record.

[4] The trial court sometimes referred to DCS as CPS, which is the acronym for its former name, Child Protective Services.

January 13, 2017[,] and the Minor Child was adjudicated a CHINS on April 11, 2017.

The Court entered a Dispositional Decree on May 9, 2017[,] that required Mother and Father to engage in services, and the Minor Child is still under this Dispositional Decree. Father was to attend and complete all parenting assessments and the recommendations of these assessments, visitation with Minor Child, Father Engagement, and individual therapy and co-parenting classes. …

Father was ordered to complete Father Engagement with Family Focus. During the period of February 2017 [to] August 2017, Father only met with the Lifeline Caseworker, Nancy Koedyker, four times for the 13[-]week program. She was largely unsuccessful in contacting him and arranging visits as Father would not be available and there were several no-shows. Father consistently wished to get custody of Minor Child but expressed distrust of CPS and that he did not want the services required by CPS. Father met with caseworker, [Brian Gabel],[5] a total of 9 times for this program. However, Father only completed about six weeks of the program as the caseworker was engaged in reviewing prior materials due to Father's no-show absences and the period of time since they went over the materials. The program began in February 2018 and should have been completed in May 2018. Father contacted the caseworker on May 22, 2018[,] and stated that he would not be continuing the Father's Engagement sessions until the Little League baseball season concluded in June 2018, as he did not want to miss any of his son's Little League Games. The Caseworker attempted to

_____

[5] The trial court erroneously referred to Brian Gabel as "Paul Hannon," who was the social worker at Family Focus who provided individual therapy to Father. Tr. at 35.

contact Father at the end of June 2018 but was unsuccessful and Father never restarted the program.

Father met with a social worker from Family Focus and his compliance was inconsistent. Father attended the scheduled sessions sporadically until the months of July and August of 2018 whe[n] attendance was more consistent. Father failed to attend the sessions because of his work schedule and desire to attend baseball games for his son and continued to express anger and frustration over the process of engaging with the providers.

Father was ordered to engage in [a] parenting curriculum, which is a 12-week curriculum. Father has only completed 3 classes out of the 12 and cited [as] his reasons for not attending [that] it was interfering with his attendance at his son's Little League baseball games. However, he did not complete the curriculum upon the conclusion of the baseball season.

Father was also ordered to engage in supervised visitations with the Minor Child over the course of this case. The visitations were ordered to be supervised, as he has not had custody of the Minor Child since December of 2016 and it was in the best interests of the Child to reintroduce Father to the Minor Child as he was not a consistent figure in her life until this time. The visits with Father began in August of 2017 and Father stopped the visits from September to December of 2017 as he did not want to participate in weekly visits, which were scheduled for one hour a week each week. Father restarted the visits in January of 2018 and has remained about 80% compliant in attending the scheduled visits. There were issues with Father not confirming visits and some visits did not occur because of the lack of confirmation. Father began missing visits during the baseball season in May of 2018.

The visit supervisor, Donna Besse, reports that the Minor Child did not bond with Father and exhibited negative behaviors during these visits. Father rejects these contentions and states that the visits with the Minor Child have [gone] well and have been getting better. Father testified that he wants a relationship with the Minor Child, but he was frustrated that all of the service providers were telling him what to do and would not let him parent the Minor Child as he wants to. Father expressed that he wants to raise the child how he wants to, not how Donna wants and that he has a personal conflict with Donna Besse. Also, Father has expressed to various providers that he has a personal conflict with Donna Besse during this case. The CASA, Renee Conley, who has been involved in this case since February of 2017, testified that she attended only a few visits but she observed the personal conflict between Father and the visit supervisor, Donna Besse, and reports that the visits have progressed well. The Court finds that the conflicting testimony of the CASA and the Visit Supervisor as to the quality of the visits is immaterial. While a personal conflict with the visit supervisor did exist, the fact remains that Father completed only 80% of the visits offered and he had never progressed to unsupervised visitations with the Minor Child over the course of nineteen months and by his own admission that he never completed the court ordered services. Father's obstinate refusal to take directions with various service providers in accomplishing the plan goals to reunite him with the Minor Child is certainly not in the best interest of the Minor Child and is contrary to achieving permanency for the Minor Child.

It was established by the DCS by clear and convincing evidence that the allegations of the petition are true in that:

* * *

b.    There is a reasonable probability that the conditions that resulted in the Minor Child's removal or the reasons for

the placement outside the parental home will not be remedied and/or the continuation of the parent/child relationship poses a threat to the well-being of the Child, in that:

1. Mother has voluntarily consented to the termination of her parental rights of the Minor Child.
2. Father was ordered to engage in services over the course of nineteen months and failed to remain compliant.
3. Father exhibited, and continues to exhibit, frustration with taking direction from service providers in meeting the needs of the Minor Child.
4. Father attended only about 80% of the visits with the Minor Child and never progressed to unsupervised visitation over the nineteen[-]month period.
5. Father failed to complete the Father's [E]ngagement program.
6. Father failed to complete [a] parenting curriculum.
7. Father failed to balance work and the needs of the Minor Child by remaining non-compliant with services for the Minor Child because of attending baseball games for his older child.

c. Termination is in the best interest of the Minor Child in that:

1. The Minor Child needs a safe, stable abuse[-]free home that Mother cannot provide.
2. [T]he Mother has consented to the termination of her parental rights.
3. [T]he Father cannot adequately provide the Minor Child with the permanency that she requires that can be provided in the prospective adoptive home.

d.   The DCS has a satisfactory plan for the care and treatment of the Minor Child, which is adoption.

CONCLUSIONS OF LAW

* * *

There is a reasonable probability that the conditions that resulted in the removal of the Minor Child or the reasons for the placement of the child outside the home will not be remedied.  It is in the best interests of the Minor Child that the parent/child relationship be terminated. The DCS has a satisfactory plan for the care and treatment of the [M]inor [C]hild.

App. at 45-48 (cleaned up).  Father now appeals.

# Discussion and Decision

## Standard of Review

[11]   Father maintains that the trial court's order terminating his parental rights was clearly erroneous because it was not supported by evidence that he will not likely remedy the conditions that resulted in Child's removal and that the continuation of the parent-child relationship poses a threat to the well-being of Child.[6]  We begin our review of this issue by acknowledging that "[t]he

---

[6]   As Father notes, there also appears to have been at least one significant procedural irregularity in the CHINS proceedings; the dispositional decree failed to address any reason why Child was not initially placed with Father as the "least restrictive (most family like)" placement in accordance with Indiana Code Section 31-34-19-6(1)(A).  Such a failure may interfere with fundamental parental rights.  *N.L. v. Dep't of Child Serv.* ("*In re N.E.*"), 919 N.E.2d 102, 108 (Ind. 2010) (also noting that procedural irregularities in CHINS

traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* And "[i]t is well established that the involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed." *Z.G. v. Marion Cty. Dep't of Child Serv. ("In re C.G.")*, 954 N.E.2d 910, 916 (Ind. 2011). However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[12] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:

proceedings may be of such import that they deprive a parent of due process in subsequent TPR proceedings). However, because we find the TPR order was clearly erroneous as a matter of statutory law, we decline to address the constitutional issue. *See, e.g.*, *Snyder v. King*, 958 N.E.2d 764, 786 (Ind. 2011) (discussing the "cardinal principle" that we will not pass upon a constitutional question unless it is "absolutely necessary to do so").

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

\* \* \*

(C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. *Id.* DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[13] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous.

*Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[14] Here, in terminating Father's parental rights, the trial court entered specific findings. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* We will reverse a termination of parental rights only upon a showing of a "clear error that leaves us with a definite and firm conviction that a mistake has been made." *D.M. & D.G. v. Marion Cty. Off. of Fam. & Child.* ("*In re J.M.*"), *802 N.E.2d 40, 44 (Ind. Ct. App. 2004), trans. denied*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996).

## Conditions that Resulted in Child's Removal

[15] In determining whether the evidence supports the trial court's conclusion that Father was unlikely to remedy the reasons for removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for his or her children at the

time of the termination hearing, taking into consideration evidence of changed conditions. *Id.* The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). However, such a determination "must be founded on factually-based occurrences as documented in the record—not simply speculative or *possible* future harms." *A.A. v. Ind. Dep't of Child Serv.* ("*In re V.A.*"), 51 N.E.3d 1140, 1146 (Ind. 2016) (emphasis original).

Here, "removal" of Child was, in effect, a removal from both parents, even though Child only resided with Mother and not Father. *See Wagner v. Grant Cty. Dep't of Child Serv.*, 653 N.E.2d 531, 533 (Ind. Ct. App. 1995). However, "in order to determine whether there is a reasonable probability that the conditions necessitating [a child's] removal will not be remedied such that termination of [non-custodial, biological] Father's rights is warranted, we must consider only those reasons attributable to Father." *In re V.A.*, 51 N.E.3d at 1146. And "the factors identified by the trial court as conditions that will not be remedied are relevant only if those conditions were factors in DCS' decision to place [the child] in foster care in the first place." *J.H. v. Ind. Dep't of Child Serv.* ("*In re I.A.*"), 934 N.E.2d 1127, 1134 (Ind. 2010); *see also O.K. v. Ind. Dep't of Child Serv.* ("*In re D.K.*"), 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) ("[A] court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent.").

[17] Thus, in *In re I.A.*, for example, our Supreme Court held that the reasons the child was removed from Mother were not relevant to the determination whether the non-custodial Father's parental rights should be terminated. 934 N.E.2d at 1134. Yet, the Court noted, the TPR order regarding the Father was completely silent as to conditions that led to the child being placed in foster care rather than with the Father; therefore, DCS had "failed to demonstrate by clear and convincing evidence that there is a reasonable probability that the reasons for placement outside the home of the parents will not be remedied." *Id.* at 1135.

[18] The instant case is similar to *In re I.A.* It is undisputed that the reasons Child was removed from Mother related solely to Mother's neglect of Child. There is no evidence at all regarding why Child was not placed with Father at the time of removal from Mother.[7] There is some evidence that, *after* Child's removal and placement in foster care, DCS "[r]uled out" placement with Father "due to concerns over stability, criminal history, and alcohol consumption." Ex. at 170 (April 27, 2017, Predispositional Report). A trial court may consider conditions that emerge subsequent to initial removal and that would justify continued

---

[7] The TPR order noted that Father was required to engage in supervised visits because "he has not had custody of the Minor Child since December of 2016 and it was in the best interests of the Child to reintroduce Father to the Minor Child as he was not a consistent figure in her life until this time." However, there is no finding related to the reason Child was not placed with Father to begin with. Moreover, the sole fact that Child did not know Father well is not a sufficient reason to either order supervised visitation or fail to place Child with Father to begin with. There is no evidence that Child had any familiarity with the foster family before DCS placed her with them. And "there is a presumption that a child's best interests are ordinarily served by placement in the custody of the natural parent." *A.C. v. Ind. Dep't of Child Serv.* ("*In re B.W.*"), 17 N.E.3d 299, 310-11 (Ind. Ct. App. 2014) (quotations and citations omitted).

removal. *See, e.g.*, *Inkenhaus v. Vanderburgh Cty. Off. of Family & Child.* ("*In re A.I.*"), 825 N.E.2d 798, 806-07 (Ind. Ct. App. 2005), *trans. denied*. However, the only evidence of Father's "criminal history" is a statement in the March 10, 2017, parenting assessment that Father "was *charged* with disorderly conduct in 2015." Ex. at 5 (emphasis added). There is no evidence that Father was ever convicted of a crime or that he ever committed any criminal act in Child's presence. There is also no evidence that Father was ever diagnosed with any sort of anger-related mental health issue or that he ever expressed anger in Child's presence. And there is no evidence that Father abused alcohol or that he ever consumed alcohol in Child's presence. Thus, there is no evidence in the record showing reasons for Child's initial or continued placement away from Father.

[19] Perhaps because of this dearth of evidence, the trial court did not make any findings related to Father's alleged issues with anger and alcohol or his alleged criminal history. Rather, in its order terminating Father's parental rights, the trial court relied solely upon evidence of Father's failure to fully participate in and complete services. And on review of a TPR order, "our analysis is centered on the findings of fact and conclusions of law determined by the trial court." *In re V.A.*, 51 N.E.3d at 1144.

[20] The evidence supports the trial court's conclusions that Father failed to fully participate in and complete court-ordered services such as individual therapy and failed to participate in some scheduled visitations. However, Father's failure to fully participate in services, alone, cannot sustain the TPR order. A

termination of parental rights must be based on some showing of parental unfitness, and that showing "must be established on the basis of individualized proof." *Tipton v. Marion Cty. Dep't of Pub. Welfare*, 629 N.E.2d 1262, 1268 (Ind. Ct. App. 1994). Although a trial court may consider the services offered by DCS and Father's response to those services as evidence regarding whether problematic conditions will be remedied, *e.g.*, *A.D.S. v. Ind. Dep't of Child. Serv.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*, there must be some proof of the underlying problematic conditions for which services were required to begin with. The State may not remove a child from a biological parent without proof of a reason for the removal (or, in this case, proof of the reason for failure to place Child with Father after removal from Mother), order the parent to participate in services to remedy some unsubstantiated reason for removal, and then terminate the parent's rights to the child solely because the parent did not comply with those services.

[21] The findings that Father missed some visitations with Child are also insufficient to support the conclusion that Father is not likely to remedy the reasons for Child's initial and/or continued removal. Father missed visits toward the beginning of the CHINS case because of his son's baseball schedule. However, Father subsequently attended eighty percent of the visitations even though his full-time job required him to travel around the state. Father's "failure to attend every scheduled visitation during the course of the CHINS proceedings is not clear and convincing evidence that Father is uninterested or unwilling to parent" Child, especially given his undisputed and consistent requests for

custody and visitation and his consistent efforts during visitations to establish a bond with Child. *R.S. v. Marion Cty. Dep't of Child Serv.*, 56 N.E.3d 625, 630 (Ind. 2016).

[22] We do not condone or excuse a parent's failure to fully comply with court-ordered services. However, here, the trial court's findings that Father failed to fully participate in services and all visitations are not, alone, sufficient to support its conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied by Father.

## Continuation of Parent-Child Relationship

[23] Father maintains that the trial court's conclusion that continuation of the parent-child relationship would pose a threat to Child is not supported by the evidence. Considering the evidence most favorable to the judgment, as we must, we agree with Father. *Peterson v. Marion Cty. Office of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.

[24] As we noted above, there is no evidence in the record to support DCS's contentions that Father has a criminal history and alcohol and anger issues that affected Child in any way, much less in a way that threatened Child's well-being. Thus, the trial court did not base its decision on those allegations but solely upon Father's failure to fully participate in all services and visitations. However, the trial court failed to articulate how Father's failure to participate "threatened the well-being" of Child. Rather, the record shows that Father's visits with Child were progressing in both quality and consistency, despite

Father's personality conflict with the visitation supervisor, Besse. And Besse's own visitation reports documented that Father and Child showed affection toward each other.

[25] The only evidence of shortcomings in Father's relationship with Child are the visitation supervisor's statements indicating that she believed Father's parenting style was too permissive, insufficiently structured, and unrealistic regarding expectations of Child. However, the State may not forever terminate a parent/child relationship because it disagrees with a particular parenting style. And the only other evidence relevant to an alleged threat to Child's well-being is that Father missed some of his visitations with Child due to his work schedule and his commitment to take his other child to his baseball games. But scheduling difficulties alone are not a sufficient reason to forever terminate a parent/child relationship. There is no evidence that, if Father had custody of Child, he would fail to provide adequate childcare for her while he was at work or his other child's sporting events.

[26] "The law makes abundantly clear that termination of a parent's relationship with a child is an extreme measure to be used only as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *Rowlett v. Vanderburgh Cty. Off. of Fam. & Child.*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006), *trans. denied.* DCS has failed to provide clear and convicting evidence that this case has reached that point.

The evidence does not support the trial court's finding that Father's continued relationship with Child will pose a threat to her well-being.[8]

# Conclusion

CHINS and TPR proceedings are designed to protect children from harm, not punish parents for their parenting imperfections. *See, e.g.*, *S.K. v. Ind. Dep't of Child Serv.* ("*In re S.K.*"), 124 N.E.3d 1225, 1233 (Ind. Ct. App. 2019), *trans. denied*. And the termination process is not to be used for the sole purpose of requiring parents to conform to a particular style of parenting. Indiana's termination of parental rights statute "sets a high bar for severing th[e] constitutionally protected [parent/child] relationship." *In re R.S.*, 56 N.E.3d at 628. Given the record before us, we do not believe that bar has been met in this case.

We find insufficient evidence to support the drastic act of permanently severing Father's relationship with Child. Therefore, we reverse the trial court's order terminating Father's parental rights.

---

[8] The trial court also concluded under the "best interests of the child" factor that Father could not "adequately provide the Minor Child with the permanency that she requires that can be provided in the prospective adoptive home." App. at 48. Father does not challenge the court's findings regarding the "best interests" factor. However, we note that "a need for permanency alone is not sufficient to support termination" of parental rights. *K.W. & B.S. v. Ind. Dep't of Child Serv.* ("*In re A.S.*"), 17 N.E.3d 994, 1006 (Ind. Ct. App. 2014), *trans. denied*.

Reversed.

Kirsch, J., and Mathias, J., concur.