## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 25 2015, 9:06 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kristina J. Jacobucci
Newby, Lewis, Kaminski & Jones, LLP
La Porte, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: A.B., Minor Child,

N.S., Father,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 25, 2015

Court of Appeals Case No. 46A05-1408-JT-379

Appeal from the LaPorte Circuit Court

The Honorable Thomas J. Alevizos, Judge

The Honorable Nancy L. Gettinger, Magistrate

Cause No. 46C01-1405-JT-165

**Brown, Judge.**

N.S. ("Father") appeals the involuntary termination of his parental rights with respect to his daughter A.B. Father raises one issue, which we revise and restate as whether the evidence is sufficient to support the termination of his parental rights. We affirm.

### Facts and Procedural History

At some point, Father pled guilty to sexual misconduct with a minor and was incarcerated on May 17, 2012. Father's estimated discharge date is June 23, 2015. On July 4, 2012, M.B. ("Mother") gave birth to A.B. On February 6, 2013, the court entered an order titled "DETENTION/INITIAL ORDER" which found that probable cause existed to believe that A.B. was a child in need of services ("CHINS") and that it was in A.B.'s best interest to be detained in foster care.[1] Petitioner's Exhibit 1 at 1. A.B. was detained because Mother did not give her seizure medicine for about two months.

On February 13, 2013, A.B. was placed in the foster home of J.S. When A.B. first arrived in J.S.'s home, she had a seizure disorder and was on medication. J.S. had A.B. in her home for two and one-half months before A.B. "went with [Mother] to . . . a mother and child placement." Transcript at 24. In August or September 2013, A.B. returned to J.S.'s home. A.B. underwent more testing and it was determined that she no longer needed to be on seizure medication.

---

[1] The record does not contain a copy of the CHINS petition.

[4]     Meanwhile, on February 27, 2013, the court held a hearing at which Father appeared telephonically, and the court appointed an attorney for Father.[2] That same day, the court entered an order in which the court found that Mother admitted the allegations of the CHINS petition and adjudged A.B. a CHINS "regarding [Mother] only." Petitioner's Exhibit 3 at 1. The order states: "Father having been advised of his/her rights and having heard the allegations of the petition now enters a denial [at] this time." *Id.* at 2. The order also states: "By agreement of the parties, matter goes to immediate disposition. Parties agree to waive requirement of predispositional report." *Id.* Under the heading "DISPOSITIONAL ORDER," the court listed the actions Mother should complete. *Id.* The court set the matter for review and continued the hearing for Father to June 5, 2013, and also entered an order noting that Father was in the custody of the Newcastle Correctional Facility and ordering the Newcastle Correctional Facility to allow Father access to a telephone to participate in the hearing.

[5]     On June 5, 2013, the court held a hearing at which Father appeared telephonically. The same day, the court entered a Review Order finding that Father "had complied with the case plan," but "ha[d] not participated in case planning, periodic case reviews, dispositional reviews, placement of the child, and visitation." Petitioner's Exhibit 5 at 1-2. The court ordered that Father

---

[2] The court held a number of review hearings and a permanency plan hearing. The record contains a transcript of only the termination hearing on July 21, 2014.

should cooperate with the IV-D Child Support Office to establish paternity for A.B., including taking any necessary blood tests as paid for by the Department of Child Services ("DCS").

[6] On September 11, 2013, the court held a hearing and Father appeared telephonically. The same day, the court entered an order finding that Father was incarcerated and no services were being provided to him, he had not visited with A.B., and he had not participated in case planning, periodic case reviews, dispositional reviews, placement of the child, and visitation.

[7] On December 18, 2013, the court held a hearing at which Father appeared telephonically, and the court entered an order stating: "Father has not complied with the case plan. Father had been participating in programs at the New Castle Correctional Facility. He has completed a parenting class. However, he was terminated from other programs. He should participate in any programs that become available to him." Petitioner's Exhibit 9 at 1. The court also found: "Father has not visited with the child. Father is incarcerated. Father may correspond with the child through the Department of Child Services." *Id.* The court also found: "Father has not participated in case planning, periodic case reviews, dispositional reviews, placement of the child, and visitation." *Id.* at 2. The court ordered "any programs [Father] has completed while at the Department of Correction, verification or documentation of same should be released to the Department of Child Services by the Department of Correction." *Id.*

[8]     On April 2, 2014, the court held a hearing at which Father was present telephonically, and the court entered an order of even date stating: "Of the permanency planning options available, Court finds that it's most appropriate and consistent with the best interest of the child that the overall goal be concurrent planning of termination of parental rights and adoption and/or reunification."  Petitioner's Exhibit 14 at 2.

[9]     On May 21, 2014, DCS filed a verified petition for the involuntary termination of the parent-child relationship between A.B. and Mother and Father.  The petition alleged in part that Father established paternity pursuant to 46D02-1310-JP-307, but had not paid any child support due to his incarceration.

[10]    On June 4, 2014, the court held a hearing at which Father was present telephonically, and the court appointed Father counsel and scheduled a fact-finding hearing for July 21, 2014.

[11]    At some point, Father recommended his father[3] as a possible placement for A.B., and family case manager Michelle Mussman ("FCM Mussman") contacted Father's father, who informed her that he did not want A.B. to be moved from her foster placement because she had developed a bond and relationship with the foster mother and it would be more traumatic for her to be removed again and placed in someone else's home.  FCM Mussman also

---

[3] Father testified that his father was not his biological father but was the only person he knew as "dad." Transcript at 35.

received the name of Father's mother, but her family refused to be fingerprinted as part of the initial inquiry. Mother signed a consent for adoption and agreed that the pre-adoptive foster home was the best place for A.B.

[12] On July 21, 2014, the court held a hearing. According to FCM Mussman's testimony, Father had not visited with A.B. and had never been able to provide her with any financial support. Father did not take any step to legally establish paternity, but paternity testing was completed. While incarcerated, Father "took a class, it was called Resolution for Men, Building Maintenance, Culinary Arts," and he had a couple of odd jobs. Transcript at 13. At some point, Father could not participate in services because he "terminated early in a couple of his programs that he couldn't re-enroll in a time restricted program for six months after his termination date." *Id.* at 14. The court-appointed special advocate, Mary Ann McClintock ("CASA McClintock"), also testified.

[13] Father testified that he participated in Resolution for Men and the Plus Program, that he completed substance abuse classes and would complete "Building maintenance" shortly. *Id.* at 30. He indicated that he would be receiving a three-month time credit for building maintenance which would move up his release date to March 20-23, 2015. Father testified that his plan following release was to "get a job established, get some more education and if I get my rights granted to me, build a bond and relationship with" A.B. *Id.* at 31. He testified that he spoke to A.B. over the phone a few times when she was about two to three months old.

On July 25, 2014, the court entered an order terminating Father's parental rights. Specifically, the order states in part:

> 6. Further, it was established by clear and convincing evidence that the allegations of the petition are true in that:
>
>    a. Child has been removed from parents for at least six (6) months under a dispositional decree of the Court in Cause Number 46C01-1302-JC000052:
>
>    b. There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for the placement outside the parent's home will not be remedied: and that
>
>    c. Termination is in the best interest of the child.
>
> 7. In support thereof the Court makes the following findings of fact and conclusions of law:
>
> . . . .
>
>    c. At the time of Child's removal, Father was incarcerated. He has, in fact been incarcerated for her entire life and has never had any contact with her other than a telephone call when she was only a few months old.
>
>    d. Father has now established through genetic testing that he is the biological father of Child, but has not established paternity by affidavit or court proceeding.
>
>    e. Father has not provided financial support nor been able to visit, hold or have meaningful interaction with Child during any time her entire life.
>
>    f. Father is incarcerated with the Indiana Department of Correction (IDOC) at the New Castle Correctional Facility. He was incarcerated after pleading guilty to Sexual Misconduct With a Minor, a Class B Felony. Currently, Father's release date is June 23, 2015. Upon his release, he will be required to be on the sex offenders' registry for ten (ten) years.
>
>    g. Although the IDCS was limited in the services it could offer Father due to his incarceration, he did initiate some services available to him through IDOC. He started but did not finish a program in Building Maintenance, Culinary Arts and a

program called Resolution for Men, and what he refers to as "Substance Abuse Classes". Because he failed to complete the programs, he had to wait and [sic] additional six (6) months before he could participate in programming again. Currently he is participating in PLUS and Building Maintenance programs. Father believes if he completes these classes his release date will be modified to March 2015.

h. Father has not participated in any parenting education or support group for parents.

i. Father's plan is to return to LaPorte County, to find employment and to establish a home.

j. In addition, the IDCS believes he will need further evaluation and services should [he] be considered as safe parent for Child.

k. Father has participated in all review hearings in the underlying CHINS by way of telephone. He has been represented by counsel throughout the CHINS, the same attorney who represented him in the petition at bar. Father had asked IDCS to consider placing Child with his [f]ather and to also consider placement with his Mother.

l. When IDCS contacted the individual Father referred to as his [f]ather, he indicated that he did not want to be considered as a placement for Child because he believed she was bonded to her current foster mother and should remain in foster mother's care.

m. The FCM of the IDCS also contacted Father's mother, Child's paternal grandmother but she refused to complete the criminal background checks to be considered for placement.

n. Child has been in the same foster home since her removal with the exception of a short time when the Child was placed with Mother in a home that could accommodate both Mother and Child. That placement failed and Child was returned to her former foster mother within a few months where she remains today.

o. Child has developed well in her foster home overcoming some initial concerns by her CASA of potential developmental delays.

p. IDCS has a satisfactory plan for the care and treatment of the child, which is: adoption by the current relative caregiver.

q. [C]hildren also have a paramount need for permanency, which we have called "a central consideration in determining the child's best interests." K.T.K.[ v. Ind. Dep't of Child Servs., Dearborn Cnty. Office], 989 N.E.2d [1225,] 1235 [(Ind. 2013)] (quoting [In re] G.Y., 904 N.E.2d [1257,] 1265 [(Ind. 2009), reh'g denied] (substitutions omitted). Indeed, just as social science confirms the value of father, it also confirms the value of permanency. E.g., Thaddius A. Townsend, Going Before Solomon with a Special Request: The Need for Clearer Legal Recognition of Shared Custody Rights Between Parents and Nonbiological Parents, 41 Cap. U. L. Rev. 327, 351-52 (2013) ("Child welfare experts have recognized that legally secure permanent placement is necessary for a child's psychological stability and sense of belonging." (internal quotation marks omitted)). For that reason, our laws that require reasonable family-preservation efforts are balanced by mandates aimed at accomplishing speedy permanency. * * *[4] Simply put children cannot wait indefinitely for their parents to work toward preservation or reunification – and courts "need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." K.T.K., 989 N.E.2d at 1235 (internal quotation marks omitted). *In re E.M.*, 4 N.E.3d 636, 647-648 (Ind. 2014).

Appellant's Appendix at 13-16 (footnote omitted).

---

[4] Asterisks appear in original.

## *Discussion*

The issue is whether the evidence is sufficient to support the termination of Father's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[16] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261 & n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dept. of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[17] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'"

*Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967)). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A)).

A. *Removal for Six Months*

[18] Father argues that DCS failed to prove by clear and convincing evidence that A.B. was removed from Father for at least six months under a dispositional decree especially because no CHINS adjudication was ever entered as to Father. Father also argues that the court made no reference to services for or participation by Father in the court's February 27, 2013 Dispositional Order.

[19] DCS posits that assuming Father's argument is true, he waived it, and that, waiver notwithstanding, the record is clear that A.B. was removed from Father and at the time of removal Father was incarcerated and remains incarcerated without the ability to provide care, support, supervision, or shelter. In his reply brief, Father maintains that he did not waive this argument on appeal because the trial court committed a fundamental error when it found that A.B. was removed from Father for six months under a dispositional decree.

[20] The record reveals that Father was incarcerated at the time A.B. was removed from Mother's care. Father's absence due to his criminal activities, taken together with Mother's failure to provide necessary medication, necessitated

A.B.'s placement into foster care. Father was present telephonically at the hearings during the CHINS proceedings including February 27, 2013, June 5, 2013, September 11, 2013, December 18, 2013, and April 2, 2014. Under the circumstances, we conclude that A.B. was effectively removed from Father's custody for the statutorily mandated minimum of six months. *See Matter of K.H.*, 688 N.E.2d 1303, 1304-1305 (Ind. Ct. App. 1997) (addressing the father's argument that his child was never removed from his custody under a dispositional order because the child was removed from the mother's custody while he was incarcerated and holding that, although the mother had legal custody and the father was incarcerated, the child had been effectively removed from the custody of both parents when taken from the mother and placed in foster care, and the child had been effectively removed from father's custody for the statutorily mandated minimum of six months); *Wagner v. Grant Cnty. Dep't of Pub. Welfare*, 653 N.E.2d 531, 533 (Ind. Ct. App. 1995) (holding that although the father did not have physical custody of the child at the time she was removed, the child was nonetheless effectively removed from both parents when she was removed from the physical custody of mother pursuant to a dispositional decree and placed in foster care while the father was incarcerated); *Tipton v. Marion Cnty. Dep't of Pub. Welfare*, 629 N.E.2d 1262, 1266 (Ind. Ct. App. 1994) (holding that the children were effectively removed from both of their parents when they were removed from the physical custody of the mother and placed in another home pursuant to a dispositional decree).

B. *Completion of Parenting Class*

[21] Father points out that the trial court specifically found that he had completed a parenting class through the Department of Correction in its December 18, 2013 Review Order. Father contends that, despite this finding, the court found in its Termination Order that Father has not participated in any parenting education or support group for parents.

[22] DCS acknowledges that the court's December 18, 2013 order found that Father had completed a parenting class but asserts that it is not clear whether the parenting class included a support group for parents. DCS also contends that the challenged finding does not warrant reversal as it is not the sole support for any conclusion necessary to sustain the judgment of the court.

[23] In its December 18, 2013 order, the court stated: "He has completed a parenting class." Petitioner's Exhibit 9 at 1. The court's July 25, 2014 termination order states: "Father has not participated in any parenting education or support group for parents." Appellant's Appendix at 14. Father does not point to the record other than the statement in the December 18, 2013 order for the idea that he completed a parenting class. Father testified at the termination hearing and did not specifically mention attending or completing any parenting education. We cannot say that the discrepancy in the court's orders renders the termination order clearly erroneous.

## C. *Remedy of Conditions*

[24] Father contends that the record does not support a finding that there was a reasonable probability that the conditions resulting in removal would not be remedied. He contends that he participated in a parenting class, but does not cite to the record and our review does not reveal that Father participated in such a class. Father also argues that because no formal CHINS adjudication was entered against him, the specific reasons for A.B.'s removal were solely related to Mother's conduct, that he should not be held liable for Mother's neglect, and that the conditions that led to A.B.'s removal have been remedied because she no longer needs to be on medication for seizures. Father also relies upon *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*.

[25] DCS argues that *Rowlett* is distinguishable. DCS points out that Father has been incarcerated since A.B.'s birth and that Father was not sure whether he could have contact with children after his release due to the nature of his conviction. DCS also maintains that the court did not hold Father liable for Mother's conduct but for his own criminal conduct resulting in his incarceration.

[26] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). To determine whether there is a reasonable probability that the conditions which resulted in the removal of the child will not be remedied, the trial court

must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *Id.* (citation and internal quotation marks omitted). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.*

[27] We cannot say that the court held Father liable for Mother's actions. As noted, Father's absence due to his criminal activities, taken together with Mother's failure to provide necessary medication, necessitated A.B.'s placement into foster care. The record reveals that Father was incarcerated at the time of A.B.'s birth and at the time of A.B.'s placement in foster care, and that he was not estimated to be released until almost a year after the termination hearing or

more than seven months after the termination hearing if Father earned an earlier release.

[28] Father has not visited with A.B. and has never been able to provide her with any financial support. In its December 18, 2013 order, the court ordered that Father may correspond with A.B. through DCS, but Father did not contact A.B. in the seven months between the court's order and the termination hearing. Even though paternity testing was completed, Father did not take any step to legally establish paternity. While incarcerated, Father "took a class, it was called Resolution for Men, Building Maintenance, Culinary Arts," and he had a couple of odd jobs, but at some point, Father could not participate in services because he "terminated early in a couple of his programs that he couldn't re-enroll in a time restricted program for six months after his termination date." Transcript at 13-14.

[29] FCM Mussman testified that she did not think that the conditions that resulted in A.B.'s removal were likely to be remedied. CASA McClintock testified that Father was unable to provide A.B. with any care, treatment, or housing. CASA McClintock also testified that she did not believe that it would be fair to have A.B. wait over a year for permanency in her life.

[30] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there was a reasonable probability that the conditions leading to A.B.'s removal would not be remedied.

To the extent that Father cites *Rowlett*, we observe that the incarcerated father in that case had participated in nearly 1,100 hours of individual and group services, had earned twelve hours of college credit, and was enrolled in an additional eighteen hours. 841 N.E.2d at 622. Here, Father could not participate in services at one point because he terminated early in certain programs. The father in *Rowlett* maintained a relationship with his children while incarcerated by sending letters and communicating over the telephone. Here, Father only had contact with A.B. over the phone a few times when she was two to three months old. To the extent that similarities between this case and *Rowlett* may have permitted the trial court to find in Father's favor, unlike *Rowlett*, the evidence was not compelling enough to require it. *See In re E.M.*, 4 N.E.3d at 647 ("The similarities between this case and *Rowlett* may have *permitted* the trial court to find in Father's favor—but unlike *Rowlett*, the evidence was not compelling enough to *require* it.").

D. *Best Interests*

We next consider Father's assertion that DCS failed to demonstrate that termination of his parental rights was in A.B.'s best interests. Father points to his participation in a number of classes through the Department of Correction. He contends that he continued to be involved throughout the CHINS proceedings and continuously expressed his desire to care for and develop a relationship with A.B.

[33] We are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*. This Court has previously recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*.

[34] There has not been a time that Father has not been incarcerated during A.B.'s life, nor has Father had significant contact with A.B. FCM Mussman testified that the termination of the parent/child relationship was in A.B.'s best interest

because A.B. does not have a relationship with Father and she does not know who he is. FCM Mussman also testified that A.B. has a relationship with her current foster placement, she has bonded very well, her medical needs are taken care of, and she is in a very good placement. FCM Mussman and the foster mother testified that if the court terminated Father's parental rights, then the plan for A.B. would be adoption by the foster mother. FCM Mussman testified that A.B. had been involved with DCS for seventeen months and if termination was not granted, then A.B. would have to wait for permanency at least another year for Father to be released from prison and another possible six months for additional services to determine if Father could parent A.B. and meet her needs. CASA McClintock testified that she believed that termination of that parental relationship was in A.B.'s best interest.

[35] Based on the totality of the evidence as discussed and set forth in the trial court's order, including the recommendation of FCM Mussman and CASA McClintock, and in light of our deferential standard of review, we conclude that the court's determination that termination was in A.B.'s best interests is supported by clear and convincing evidence. *See In re J.C.,* 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (observing that "[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests"), *reh'g denied; In re A.I.,* 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court appointed advocate and family case manager, coupled with evidence that conditions resulting in

continued placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*. *See also In re E.M.*, 4 N.E.3d at 649 (holding that incarceration alone cannot justify "tolling" a child-welfare case and concluding that, because the trial court could reasonably have reached either conclusion, our deferential standard of review is dispositive and it was not clearly erroneous for the trial court to conclude that, after three and a half years, Father's efforts simply came too late, and that the children needed permanency even more than they needed a final effort at family preservation).

## Conclusion

[36] We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence. We find no error and affirm.

[37] Affirmed.

Bailey, J., and Robb, J., concur.